502 P.2d 1346

**STATE of Arizona, Appellee,**

v.

**Milford Glen MELOT, Appellant.**

**No. 2166.**

Supreme Court of Arizona,
In Banc.

Nov. 22, 1972.

528

Gary K. Nelson, Atty. Gen., Albert M. Coury, Former Asst. Atty. Gen., Phoenix, for appellee.

Ross P. Lee, Maricopa County Public Defender, James H. Kemper, Deputy Public Defender, Phoenix, for appellant.

LOCKWOOD, Justice:

Milford Glen Melot was charged with murder in violation of A.R.S. §§ 13–451; 452; 453. He was tried by jury, convicted of voluntary manslaughter and sentenced to serve a term of not less than nine nor more than ten years in the state penitentiary.

On July 22, 1969, defendant and his brother, Joe Melot, had been drinking a great deal at defendant's home and they began arguing. The hostility became so intense that the defendant's daughter-in-law Lynn Melot went outside the house.

At that time she observed the defendant leave the house and procure a gun from his truck. Defendant testified that when he returned his brother said, in reference to defendant's gun, "if you are going to use it, you'd better use it. I'm going to take it away from you and use it on you." He then started toward the defendant and the defendant "raised the pistol and started shooting." According to the testimony of Lynn Melot "five or more shots were fired." The defendant testified that he called the police.

Officer Francis Malody received a call from the dispatcher summoning him to the defendant's home to investigate a shooting. The defendant met him at the door and led him into the living room where the dead body of Joe Melot was found. Subsequently a number of other officers arrived to investigate and defendant was handcuffed, advised of his rights and taken to the police station interrogation room.

The first question raised by defendant on appeal is whether the trial judge improperly admitted various statements made to the police officers who investigated the shooting. The defendant argues that he was not given *Miranda* warnings and he was interrogated while in custody and when the officers gave him the warnings he informed them that he chose to remain silent but he was nevertheless interrogated. The challenged statements were given in response to questions asked by Officers Francis Malody, John Yeitrakis and John Sellers.

## STATEMENTS MADE TO OFFICER MALODY

Upon arrival at the defendant's home Officer Malody approached the door where defendant was standing and asked "what happened?" Defendant responded, "I just shot my brother." Whereupon Melot opened the door and Malody entered and asked "where [his brother] was and where [the weapon] was?" Defendant responded, "[h]e's in the livingroom, the gun is in the desk in the hallway."

The procedural warnings prescribed in Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L.Ed.2d 694 (1966) are compulsory at the onset of two critical factors: custody and interrogation:

> "The principles announced today deal with the protection which must be given to the privilege against self-incrimination when the individual is first subjected to police interrogation while in custody at the station or otherwise deprived of his freedom of action in any significant way." 384 U.S. at 477, 86 S.Ct. 1629, 16 L.Ed.2d 725.

We have established that determination of whether custody exists is made "by an analysis of the relevant circumstances with particular attention to probable cause gauged by the 'reasonable man' test." State v. Mumbaugh, 107 Ariz. 589, 594, 491 P.2d 443, 448 (1971). Accordingly,

> "* * * the warning must be given when the police have reasonable grounds to believe that a crime has been committed, and also reasonable grounds to believe that the defendant is the one who committed it." State v. Thomas, 104 Ariz. 408, 410, 454 P.2d 153, 155 (1969).

Upon arrival at defendant's home Officer Malody might have had reasonable cause to believe a crime had been committed. However, it is unquestionable that the defendant's mere presence at the scene did not give him reasonable cause to believe that the defendant had committed the crime. Therefore the initial question "what happened?" was clearly neutral, non-accusatory in nature, and in furtherance of proper preliminary investigation.

The *Miranda* decision carefully excluded from the ambit of required warnings "on-the-scene questioning" of facts surrounding a crime or other general questions of citizens in the factfinding process. The court reasoned that

> "It is an act of responsible citizenship for individuals to give whatever information they may have to aid in law en-

forcement. In such situations the compelling atmosphere inherent in the process of in-custody interrogation is not necessarily present." 384 U.S. at 478, 86 S.Ct. at 1629–1630, 16 L.Ed.2d at 725–726.

The California Court of Appeals was presented with a strikingly similar set of facts in People v. Wright, 258 Cal.App.2d 762, 66 Cal.Rptr. 95, cert. denied, 393 U.S. 896, 89 S.Ct. 154, 21 L.Ed.2d 177 (1968). An officer was called to a home to investigate a disturbance the nature of which he was unaware. Upon arrival he was confronted with two seriously injured women and the defendant.

> "The deputy had no way of knowing what had occurred, and [one woman] and the defendant each accused the other of responsibility for the incident. It was his duty as an officer to investigate, and he started his investigation, a general inquiry, with the routine question, 'what happened.' At this time defendant was not under arrest; there was not the slightest evidence in the record that he was in custody or deprived of his freedom of action. At this point the deputy was accusing no one; nor was he, through his single inquiry, 'what happened,' carrying out a process of interrogations in an attempt to elicit incriminating statements from defendant. The sole purpose of his question was to find out what had occurred; it is a justifiable type of routine inquiry designed to determine what actually happened, as a means of commencing an investigation." 258 Cal.App.2d 766, 66 Cal.Rptr. at 97.

We hold that when the officer asked "what happened" defendant was neither in custody nor being interrogated.

■ The defendant's response to the initial question was a confession to the crime. The officer at that point had reasonable cause to believe the defendant had committed a crime. In fact the officer testified that the defendant was "not free to go."

The officer proceeded immediately to the body and "began first aid and [attempts] to find any signs of life in the body." Passing through the house to the location of the body the officer observed the gun "on the desk" in the "hallway."

The factual setting in this case is similar to another California case. Officers responded to a radio broadcast directing them to a particular residence where a stabbing was said to have occurred. When they arrived the officers asked "what happened" and the defendant replied, "I did it and I'm sorry." The officers then asked "where is the knife" and he told them where it was. The California appellate court did not require exclusion of the defendant's statements concluding that:

> "[i]n the present case when Officer Hazen made the inquiry in question he did not know who had been stabbed nor had he seen the victim. The question was clearly investigatory and was relevant, at least, to the prevention of further bloodshed and the safety of the officer himself." People v. Superior Court, 3 Cal. App.3d 476, 490, 83 Cal.Rptr. 771, 781 (1970).

The instant case is distinguishable from State v. Michael, 103 Ariz. 46, 436 P.2d 595 (1968) where the facts indicated that the defendant was questioned "for the purpose of eliciting incriminatory statements." 103 Ariz. at 49, 436 P.2d at 598. After the officer was informed by the defendant's father that the defendant had shot the victim the officer proceeded to the room where he found the victim and the defendant. It was then that the officer attempted to physically restrain the defendant and ask him questions. The investigatory state had already passed at this point.

## STATEMENTS MADE TO YEITRAKIS

■ Officer Yeitrakis was the second officer to arrive at the defendant's home. He entered the door, walked "into the livingroom, observed the victim, knelt down beside [the body]" and according to his testimony asked Officer Malody "what happened?" Defendant stated "I got

tired of arguing with the son-of-a-bitch so I shot him until the gun was empty."

The Supreme Court of the United States held in Miranda, supra:

"Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated." 384 U.S. at 478, 86 S.Ct. 1630, 16 L.Ed.2d 726.

The defense contends that the determination of whether there was interrogation should be made by an inquiry into whether the defendant thought a question was intended for him. The record indicates that when Officer Yeitrakis asked the question he was "fifteen feet" away from the defendant and only one foot away from Officer Malody. The officer spoke in a "normal tone of voice as if [his listener] was a foot away," and he was not facing the defendant but was looking at the victim.

Under these circumstances defendant would not reasonably have believed that the question was directed to him. Therefore defendant's statement was voluntary and the court was correct in admitting it into evidence.

## STATEMENTS MADE TO SELLERS

After arrest defendant was taken to the police station. The record indicates that he was warned of his rights at the time of arrest and then again at the police station. The defendant unequivocally refused to answer any question. While the defendant was in custody in the police "interrogation room," Officer Sellers entered the interrogation room and "informed Mr. Melot that his brother was dead." Defendant said that he was aware of this fact. Officer Sellers then asked him "how he knew it" and defendant replied "well, I checked him at the house." The defendant objects to the admission of this statement into evidence. Then the following transpired according to the testimony of Officer Sellers:

"Mr. Melot, while he was talking to me, asked me if I was going to charge him with a crime, and I told him that he would be charged, and at that time he smiled and said, 'it was self-defense.' I asked him if he would like to explain that and he said he would prefer to talk to his attorney."

Apparently this was the extent of the conversation. We believe this does not constitute a violation of the Miranda warnings.

Defendant never claimed, throughout the entire proceedings of this case, that the statement was involuntarily given. There certainly is no indication of coercion. Defendant was aware that he had a right to remain silent and he indicated his desire to do so both before and after the statement was made. Because defendant was aware of his rights and because the record does not reveal the slightest suggestion that the statements were coerced, we believe defendant volunteered the answer to Officer Seller's statement. See Whitsell v. Perini, 419 F.2d 95 (6th Cir. 1969); McGhee v. Sigler, 328 F.Supp. 538, 541 (D.Neb.1971), aff'd. 455 F.2d 987 (8th Cir. 1972); Soolook v. State, 447 P.2d 55 (Alaska 1968), cert. denied, 396 U.S. 850, 90 S.Ct. 107, 24 L.Ed.2d 99 (1969); Guyette v. State, 84 Nev. 160, 438 P.2d 244 (1968). We find no error in admission of the statements.

In the instant case the independent evidence placing defendant at the scene of the shooting was overwhelming. Lynn Melot testified with minute detail as to all the activities of the defendant and his brother to the moment of the shooting. She stated that she observed defendant remove a gun from his truck and re-entered the house. Then she heard the shots. Terry Melot, defendant's son, testified that after the shots were fired the defendant came out of

the house and said "stay outside. I just shot Joe." The most significant independent evidence came from the mouth of the defendant. He testified at the trial that he argued with Joe, left the house to procure a gun, re-entered the house where the quarreling continued until Joe "started towards" him and he "raised the pistol and started shooting." He did not deny shooting the victim but rather argued self-defense.

## EXPERT TESTIMONY

Defendant called Charles Crawford, a Phoenix Police Officer, to explain the meaning of the results of a breathalyzer test given to the defendant at the police station after being taken into custody. The court permitted Crawford to state the reading of the machine. But the court did not permit him to state what his opinion of the reading meant. The basis for the court's refusal was that Officer Crawford was not qualified to give his opinion.

It is well settled that the competency of a witness to testify rests in the sound discretion of the trial court, and its decision will not be reversed except where an abuse of discretion is found. Carrel v. Lux, 101 Ariz. 430, 420 P.2d 564 (1966). Defendant has failed to show that it was an abuse of discretion by the trial court to refuse to permit Crawford to give his opinion.

It is our opinion that the trial court did not abuse its discretion in refusing the testimony of Officer Crawford. Defense counsel established only that Crawford was competent to operate the machine but the foundation was insufficient to indicate that he was competent to interpret the reading of the machine. See Pruitt v. State, 216 Tenn. 686, 393 S.W.2d 747 (1965).

Judgment affirmed.

HAYS, C. J., CAMERON, V. C. J., and STRUCKMEYER, and HOLOHAN, JJ., concur.