559 P.2d 121

The STATE of Arizona, Appellee,

v.

Spencer WATSON, Appellant.

No. 3089.

Supreme Court of Arizona,
In Banc.

Nov. 5, 1976.
Motion For Rehearing Denied Dec.
21, 1976.

2

Bruce E. Babbitt, Atty. Gen., by William J. Schafer, III, and Frank T. Galati, Asst. Attys. Gen., Phoenix, for appellee.

Robertson, Molloy, Fickett & Jones, P. C., by Michael J. Meehan, Tucson, for appellant.

CAMERON, Chief Justice.

This is an appeal by the defendant Spencer Watson from a jury verdict and judgment of guilt of first degree murder, A.R.S. §§ 13–451 and 452; armed burglary and burglary, A.R.S. § 13–302; armed robbery and robbery, A.R.S. §§ 13–641 and 643; theft of a motor vehicle, A.R.S. § 13–672; and obstructing justice, A.R.S. § 13–541. Defendant was sentenced to death on the murder count; concurrent 99 years to life sentences on the armed burglary, armed robbery and robbery counts; 14 to 15 years on the count of burglary; and time served on the theft of a motor vehicle and obstructing justice counts.

We must answer the following questions on appeal:

1. Was the preliminary hearing testimony of witnesses Linda Hagood, Jacqueline Knight, and Meredith Brown properly admitted into evidence?

2. Was the search of the apartment where the fruits of the crime were found an unlawful search and seizure?

3. Were the facts given to support a telephonic search warrant sufficient to support a finding of probable cause?

4. Did the trial court err in denying defendant's motion for change of venue?

5. Was the defendant's right to an impartial jury violated by the fact that he was tried in shackles?

6. Did the trial court abuse its discretion in admitting certain expert testimony?

7. Did the trial court err in refusing to disclose portions of the presentence report?

8. Was the defendant denied effective assistance of counsel?

9. Is Arizona's death penalty, A.R.S. § 13–454, void for vagueness or applied in an unconstitutionally discretionary or arbitrary manner?

10. Did the trial court err in refusing to conduct a post-conviction evidentiary hearing?

The facts necessary for a determination of this matter on appeal are as follows. On the evening of 30 May 1974, at approximately 9:00 p. m., one or more persons entered the home of Mr. and Mrs. Paul W. Miles, slipped pillowcases over the Miles' heads, bound their victims with coat hangers, forced them to lie on the floor and ransacked the house for approximately 45 minutes. Neither of the victims saw the intruders' faces, although Mr. Miles was able, from seeing one of the person's hand and arm, to say that he was black. At approximately 11:30 p. m., the Miles freed themselves and called the police. Missing were numerous items including credit cards, jewelry, silverware, and Mr. Miles' newly purchased 1974 Ford Gran Torino, which was colored light blue with a dark blue vinyl top.

At approximately 10:00 p. m. on the same night, two black men came to the door of Mr. Joseph Mascari who lived on the southwest side of Tucson approximately 3 miles from the Miles residence. Mr. Mascari spoke through a screen door to one of the men whom he identified at trial as the codefendant Timothy Reid, eventually refusing permission to use his telephone. Mr. Mascari observed the two men get into a car, which he described as a fairly new sedan with a light colored body and a darker roof. He testified that the men sat in the car which was parked across the street from his house for approximately 10 minutes before driving away.

At approximately 10:25 p. m., the two black males, one of whom displayed a gun, walked through an open door at the home of Mr. and Mrs. Albert Gallman a few blocks from the Mascari residence. The men ordered Mr. and Mrs. Gallman, who were in their dining room downstairs, to get down on the floor; one of the intruders threw a blouse over Mrs. Gallman's head. At the defendants' trials, Mrs. Gallman

identified Spencer Watson and Timothy Reid as the men, stating that Reid carried the gun.

Once Mr. and Mrs. Gallman were on the floor, the two men demanded money; one of them searched through Mrs. Gallman's purse, complaining when he discovered that it contained only $5 and some credit cards. Meanwhile, the other went upstairs, fired a shot, and forced his way into the bedroom of Nancy Gallman de Muth, the Gallman's daughter. Nancy testified that the man pointed a gun at her and ordered her to lie face down on the bed. She then heard footsteps, followed by a series of gunshots and Mr. Gallman crying out. At that point, she opened her window and slid down a pipe to the ground. At about the same time that the first shot was fired, Mrs. Gallman got up and ran out of the house.

Although not clear, it would appear that Mr. Gallman, a border patrolman, obtained a gun and fired twice before being shot 4 times in the back, and that he died as a result of his wounds. There was evidence to suggest that Mr. Gallman grabbed his revolver, which he usually kept in a briefcase in the living room and fired at defendant Reid as Reid was exiting the house. According to this version of the facts, Watson, coming down the stairs, saw Gallman firing at Reid and shot Gallman from behind.

The police investigation, which began at the Gallman residence and continued at the Miles residence, developed the following facts linking Spencer Watson to the crimes: (1) a fingerprint identified as that of Watson was found in Mr. Miles' Torino which was discovered abandoned in the desert in the early morning of 31 May 1974; (2) when the car was discovered the seat belt on the driver's side had been partially burned and a piece of the plastic bracket holding the shoulder harness away from the seat had been broken off; and (3) a number of items including some plastic spoons stated by Mr. Miles to have been left by him in his car and a piece of plastic which, according to Tucson Police Detective Reyna's testimony, matched the broken piece of the shoulder harness bracket, were found in the street across from the Mascari residence near the spot where, according to Mascari, the car driven by the individuals who came to his house had been parked.

At approximately 9:00 a. m. on 31 May 1974, Detective Reyna, who was aware that a fingerprint lifted from the Miles' vehicle had been matched to a known print of Spencer Watson, spoke to Tucson Police Detective Martin. Martin informed Reyna that on 24 May 1974, Martin and an informant named Gary Lester Thompson had driven around Tucson while Thompson provided information. Thompson had pointed out an apartment at 8570 East Cooper Street which he said was "frequented" by Spencer Watson. Martin stated that Thompson had also told him that Watson had access to Thompson's car, a white over silver-grey Cadillac.

After determining that the Cadillac was parked at the apartment complex pointed out by Thompson, five police officers including Detectives Reyna and Martin, proceeded to the apartment. The officers, with guns drawn, knocked on the door which was answered by an individual later identified as Linda Hagood. The officers informed Hagood that they were investigating a homicide and were looking for Spencer Watson whom they had reason to believe was in the apartment. She stated that Watson was not there, but the officers indicated that they would like to look for him. Hagood then opened the door, again stating that Spencer was not there, but that the officers could come in and look.

The officers entered the apartment and proceeded to check areas which might conceal a person. Upon entering the northwest bedroom, Detective Reyna noticed an object causing the skirt of the bedspread to protrude. Thinking that someone might be hiding underneath the bed, Reyna drew his gun, lay down on his abdomen and lifted the bedspread. He observed a partially open pillowcase containing various items. In particular he noticed an American Express Card bearing the name "Miles" and some pieces of silver and turquoise jewelry.

At that point, he withdrew without further searching the contents of the pillowcase and telephoned a judge to obtain a telephonic search warrant pursuant to A.R.S. § 13–1444(C). After obtaining the telephonic warrant, the officers conducted a full search of the premises and seized a number of items later introduced into evidence as having been taken from the Miles and Gallman residences.

At approximately 11:30 a. m. on 31 May, Reid and Watson were stopped for questioning by a uniformed police officer who observed the two shaking a gate and then running away at the sight of a policeman. As the officer was attempting to frisk the two men for weapons, Reid ran away from the scene. The officer grabbed Watson by the arm, but as he looked up to follow Reid's flight, Watson struck him in the left temple and also ran off. The two suspects were apprehended separately following a brief search. The obstruction charge arose out of this incident.

Reid and Watson were originally charged as codefendants. A defense motion to sever was granted on 29 July 1974 after the arraignment and omnibus hearing. On 6 September a consolidated hearing was held on various motions including defendants' motions to have a change of venue, to suppress evidence, statements and identification, and to declare the death penalty unconstitutional, as well as a motion by the State to videotape testimony. The court, by minute entry dated 10 September 1974, denied the defendants' motion for change of venue and their death penalty motion. On 18 September 1974, the court denied the motion to suppress evidence and granted the motion to suppress statements of defendant Reid. The defendants were tried separately.

## THE ADMISSION OF PRELIMINARY HEARING TESTIMONY

Linda Hagood, Jacqueline Knight, and Meredith Brown were among the witnesses who testified at the preliminary hearing. One of the girls, Meredith Brown, age 18, and the defendant Watson's girlfriend, testified to riding with Watson and Reid the night of the 30th and hearing it said that Watson had shot a man. She also testified she had seen a pillowcase in the codefendant Reid's apartment containing jewelry and credit cards.

Jacqueline Knight, age 17, testified that she was at Tim Reid's apartment and heard one of the defendants say they had "broken into somebody's house and shot whoever it was." She also saw the defendant Reid carry a pillowcase into the apartment.

Linda Hagood also testified as to conversations of the shooting and that the pillowcase containing jewelry and credit cards was in the apartment. She also testified that she answered the door when the police came to arrest Watson and admitted the police to the apartment. At the preliminary hearing, the attorneys for both defendants had an opportunity to and did, in fact, cross-examine these three witnesses, though the attorney for Watson did not elect to cross-examine Jacqueline Knight or Linda Hagood. None of these three witnesses appeared at trial and the State was allowed, over defendants' objection, to introduce the transcripts of their preliminary hearing testimony into evidence.

■ Defendant argues that the preliminary hearing testimony of witnesses Knight, Brown, and Hagood should have been excluded due to the failure of the State to establish by "competent evidence" a good faith effort to secure the appearance of those witnesses at trial. We disagree.

Rule 19.3(c)(1), Arizona Rules of Criminal Procedure (1973), provides:

"c. Prior Recorded Testimony.

"(1) *Admissibility.* Statements made under oath by a party or witness during a previous judicial proceeding or a deposition under Rule 15.3 shall be admissible in evidence if:

(i) The party against whom the former testimony is offered was a party to the action or proceeding during which a statement was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he now has (no person

6

who was unrepresented by counsel at the proceeding during which a statement was made shall be deemed to have had the right and opportunity to cross-examine the declarant, unless such representation was waived) and

(ii) The declarant is unavailable as a witness, or is present and subject to cross-examination."

■ The Sixth Amendment confrontation clause has been interpreted to require that unavailability of a witness be demonstrated in terms of a "good faith effort" on the part of the State to obtain the witness' presence at trial. *Barber v. Page*, 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968); *State v. Alexander*, 108 Ariz. 556, 503 P.2d 777 (1972).

Appended to the State's motion for leave to use transcripts of unavailable witnesses filed on 18 October 1974, were 23 exhibits documenting the attempts by the State to produce the absent witnesses. We find it unnecessary to describe in detail this documentary evidence. Suffice it to say that the exhibits included two in-county subpoenas for Knight and Brown, two bulletins to the Tucson Police Department describing Knight and Brown and requesting their detention, two Maricopa County subpoenas for Knight and Brown, documents relating to the issuance under A.R.S. § 13–1861, et seq., of a California subpoena for Knight and sworn affidavits by members of the San Francisco District Attorney's Office verifying two separate unsuccessful attempts to contact Knight pursuant thereto, one in-county subpoena for Hagood, two sets of documents relating to the issuance of Ohio subpoenas for Hagood accompanied by statements indicating two separate unsuccessful attempts to contact Hagood pursuant thereto and various other letters and statements documenting further efforts to locate these witnesses. None of these subpoenas were returned marked "served." These exhibits indicate that the prosecuting attorneys went to considerable lengths in attempting to secure the witnesses' presence at trial.

We have stated:

"A defendant's rights to cross-examine and confront the witnesses against him are not abridged by the introduction at trial of preliminary hearing testimony where the accused had the opportunity at the preliminary hearing to confront and cross-examine the witnesses against him. (citations omitted)" *State v. Lippi*, 108 Ariz. 342, 346, 498 P.2d 209, 213 (1972).

We have also stated, however that:

"From the above authorities, it appears to us that in order to satisfy the requirements of the United States and Arizona Constitutions guaranteeing to a criminal defendant the right to a face to face confrontation with the witnesses against him, the prosecution must satisfy the court through competent evidence that it has made a 'good-faith effort' to obtain a missing witness's presence at the trial. An affidavit of a prosecutor is insufficient to establish absence. Udall, Arizona Law of Evidence, § 182, at 411. Rather, in Arizona, a 'good-faith effort' to produce a missing witness must be proven by evidence consisting of, at the very least, a subpoena which has been duly issued and returned unsatisfied, and, more desirably, of the sworn testimony of the authorities charged with the duty of serving the subpoena and of the people having knowledge of the missing witness's habits and former whereabouts, of the witness's unavailability to appear in person." *State v. Alexander*, supra, 108 Ariz. at 561, 503 P.2d at 782. See also *State v. Pereda*, 111 Ariz. 344, 529 P.2d 695 (1974).

Even though there was no testimony at the trial concerning the unavailability of the witnesses as defendant claims is necessary and we believe would be preferable, we find that the evidence presented to the court satisfied the Rules of Criminal Procedure and the state and federal case law. The motion of the State for leave to use the transcripts is supported by a lengthy memorandum setting forth the efforts of the county attorney to obtain the presence of the three witnesses and the motion is sworn to by the deputy county attorney. Con-

sidering all of the material presented in the motion, we believe that the State demonstrated a good faith effort to locate the absent witnesses and that their testimony at the preliminary hearing was properly admitted.

## THE WARRANTLESS SEARCH OF THE HOUSE

■ The initial entry into the Cooper Street apartment was made without a warrant. The consequent search is therefore presumed invalid, and the fruits thereof must be suppressed unless the State is able to demonstrate the applicability of one of the recognized exceptions to the general requirement that searches be made pursuant to a valid warrant. *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *State v. Damon*, 18 Ariz.App. 421, 502 P.2d 1360 (1972). In the instant case, Linda Hagood, who was living at the apartment, had the right to admit the officers to the said apartment to look for the two defendants.

■ The State submits, and we agree, that there was a valid consent to the search and no warrant was therefore required. We have said:

"In determining whether or not there was a consent, it is necessary that such a waiver and consent be proved by clear and positive evidence in unequivocal words or conduct expressing consent, and it must be established that there was no duress or coercion, actual or implied. (citations omitted)" *State v. Kananen*, 97 Ariz. 233, 235, 399 P.2d 426, 427 (1965).

■ Moreover, the United States Supreme Court has stated that voluntariness of consent "is a question of fact to be determined from the totality of all the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 2048, 36 L.Ed.2d 854, 863 (1973).

In the present case, there were certain factors which may be taken as indicating coercion. From the testimony, it appears that Linda Hagood answered the door alone and was immediately confronted by five police officers with drawn guns. Moreover, she was initially reluctant to allow the officers to enter saying that Spencer was not in. At the preliminary hearing, she testified that she told the officer, "He's not here, you know, and you know, and you can look but he's not here." It would appear that Hagood agreed to the search because she knew that the search would be fruitless, i. e. that Spencer was indeed not at the apartment. She had nothing to conceal and could, and it would appear did, voluntarily allow the officers to enter and search for Watson.

■ There is no single factor determinative on the issue of consent. The display of guns, though pertinent, is not conclusive. *Schneckloth v. Bustamonte*, supra. Other courts have upheld findings of consent to a search even though the officers to whom consent was given made some display of arms. *United States v. Boston*, 508 F.2d 1171 (2nd Cir. 1974), cert. denied, 421 U.S. 1001, 95 S.Ct. 2401, 44 L.Ed.2d 669 (1975); *United States v. Fernandez*, 456 F.2d 638 (2nd Cir. 1972). Therefore, we cannot say that the trial court erred in its conclusion that there was voluntary consent to the search.

## PROBABLE CAUSE FOR ISSUANCE OF THE TELEPHONIC WARRANT

■ Defendant asserts that the telephonic search warrant was invalid under *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), due to the failure of the affidavit to contain underlying facts concerning the reliability of the confidential informant and the manner in which the informant obtained his information. We feel that the warrant was properly issued. We have said:

"The rule is that the affiant must show the underlying circumstances which would justify a reasonable belief that the place or places to be searched contain the contraband or other evidence that will connect the accused with his alleged crimes. * * * " *State ex rel. Flournoy*

*v. Wren,* 108 Ariz. 356, 363, 498 P.2d 444, 451 (1972).

Our statute reads as follows:

"C. In lieu of, or in addition to, a written affidavit, or affidavits, as provided in subsection A, the magistrate may take an oral statement under oath which shall be recorded on tape, wire, or other comparable method. This statement may be given in person to the magistrate, or by telephone, radio, or other means of electronic communication. This statement shall be deemed to be an affidavit for the purposes of issuance of a search warrant. In such cases if a recording of the sworn statement has been made, the magistrate shall direct that the statement be transcribed and certified by the magistrate and filed with the court." A.R.S. § 13–1444(C).

The affidavit made by telephone was recorded and reads, in part, as follows:

"JUDGE: Identify yourself with your rank and department, your number if you have one and who else is present and so forth, and then I'll swear you in.

"REYNA: Okay. Eh . . . this is DET. REYNA of the TUCSON POLICE DEPARTMENT # 4595. Present with me is MR. JIM HOWARD of the COUNTY ATTORNEY'S OFFICE and he's using a recorder to record this conversation.

"JUDGE: Very well. You solemnly swear that the information you are about to report to me is the truth, so help you God?

"REYNA: Yes, sir, I do.

"JUDGE: Very well, go ahead.

"REYNA: Okay. In the Justice Court, Tucson Precinct # 5, County of Pima, State of Arizona. Affidavit in support of a Search Warrant.

Personally appeared before me this 31st day of May, 1974, MORRIS REYNA, who, on oath, makes complaint, and deposes and says that he has and there is just and probable reason, cause to believe and he does believe that there is now in the possession of MILDRED S. REID on the premises located at Camino Seco Apts, 8750 E. Cooper, At. # 222, which consists of a 6-room apartment 2nd floor, NW Corner of the CAMINO SECO APARTMENTS complex, the following property to wit:

a. Credit cards in the name of PAUL MILES as follows:

1. American Express Credit Card # 0120138110200AX.

2. Master Charge Credit Card # 52870759363383.

3. Exxon Credit Card # 4459301171-X077400320.

4. Texaco Credit Card # 716 016 4 369U.

5. Mobil Credit Card # 865 927 314 140678.

b. Some turquoise jewelry of various descriptions.

"THAT YOU AFFIANT is a detective for the TUCSON POLICE DEPARTMENT Homicide Detail. That he is investigating a homicide which occurred at 1815 West 36th St. and an armed robbery which occurred nearby at 2040 Calle Placita, Tucson, Arizona, each crime occurring in the evening hours of the 30th of May, 1974 and each according to witnesses committed by two black males. According to the victim of the armed robbery, MR. PAUL MILES, 2040 Calle Placita, his credit cards and turquoise jewelry described above are among the items taken. According to DET. MARMION of the TUCSON POLICE DEPARTMENT, a white/grey Cadillac was seen in the neighborhood of 2040 Calle Placita at/or near the time of the armed robbery. Two negro males were seen as occupants of this car.

According to Police Records, this car matches the description of a vehicle recently being driven by SPENCER WATSON, a black male.

YOUR AFFIANT'S fellow officers have informed this officer that they have seen SPENCER WATSON driving such a car.

MR. PAUL MILES also informed your affiant that his 1974 Ford, 2-door, hardtop vehicle, license # SWB–489 was taken at the time of the armed robbery. Officers in my department recovered this vehicle approximately 5 hours after it was taken. It was abandoned approximately two miles from the MILES residence. A latent fingerprint lifted from the window of that car has been compared by ID Technicians of the TUCSON POLICE DEPARTMENT with known prints of SPENCER WATSON. These technicians informed this affiant that the prints are identical.

Records of the TUCSON POLICE DEPARTMENT show a full description of the vehicle driven by SPENCER WATSON was a 1968 white/grey Cadillac, 2-door, Arizona number for '74, # RYW–010. Your affiant has been informed by OFF. FERRAR of the TUCSON POLICE DEPARTMENT that this vehicle was located this morning at the above address.

Investigation by police officers at the apartment complex named above, revealed from two separate sources other residents, that there was only one Black couple living at the complex and that that couple lived in apartment # 222.

\* \* \* \* \* \*

"REYNA: In addition, this affiant was told by other officers investigating this case that a confidential and reliable informant related certain information about the black residents at this complex. That friends of the informant to include SPENCER WATSON and himself, the informant, had frequented the apartment in this complex resided in by a Black couple and that the Black male resident of that apartment and himself (confidential and reliable informant) had been committing nighttime residential robberies and burglaries for approximately a 4 month period. The confidential and reliable informant indicated that the Black male resident of

the complex had access to and on occasion had used a 1968 white/silver Cadillac to case the neighborhoods and eventually the house that he robbed and would use the car to leave the robbery scene also. It was indicated that on one occasion a green Mustang, belonging to the Black male resident at the complex was used to commit an armed robbery.

This affiant received information from other police officers that the confidential and reliable informant brought the police officers to the apartment complex and in fact, the green Mustang was parked there.

Based on the above information this affiant and other police officers went to apartment # 222 of the above named complex. The door was knocked on and answered by a Negro female. This affiant and other police officers identified themselves as police officers. This affiant and other police officers informed the Negro female that we were there because we had reason to believe that SPENCER WATSON was here and hiding and that we were investigating a crime. That we had reason to believe that SPENCER WATSON had committed that crime and that we had seen the . . . white/grey Cadillac that we knew he drove outside this apartment complex. She said 'SPENCER WATSON is not here.' We told her that we would like to come in and look for SPENCER. She said it was alright for us to come in to look for SPENCER. She opened the door and stepped back. This affiant and other police officers entered the apartment to secure it and looked for SPENCER WATSON. Upon leaving the western most bathroom, I looked into the northwest bedroom and noticed a disarrangement of the bedspread on the bed in the west wall of the bedroom. There was a protrusion on the southeast corner of the bed at the floor level.

In my experience as a police officer, it is common to find subjects hiding un-

der beds. With caution I approached the bed and raised the bedspread skirt to see who was under the bed if anyone. At this time, I was on my stomach and as I raised the skirt of the spread, I saw an AMERICAN EXPRESS CREDIT CARD with the name MILES on it, and a silver and turquoise object, apparently jewelry. At this point, I determined that there was no one under the bed and looked no further.

The crime being investigated at the time was the property of a PAUL MILES and the robbery homicide of ALBERT GALLMAN, because this affiant had conducted the scene investigation of the robbery of PAUL MILES, it was within my knowledge that an AMERICAN EXPRESS CREDIT CARD had been taken from PAUL MILES and that certain pieces of silver Indian jewelry had also been taken. That based on the above facts, your affiant prays that a search warrant be issued with respect to the above location for the seizure of said property and that the same be brought before a Magistrate or held under Arizona Revised Statute # 13–1450 and disposed of according to law."

At the time the warrant was issued, the judge had before him the following facts: (1) that an armed robbery had occurred at the home of Mr. Paul Miles, 2040 Calle Placita, and that certain credit cards and turquoise jewelry had been taken; (2) that a white over grey Cadillac had been seen in the neighborhood of the Miles residence at or near the time of the armed robbery; (3) that that car had been occupied by two negro males; (4) that members of the Tucson Police Department had recently seen Spencer Watson driving a vehicle matching this description; (5) that police department records provide a full description of the car in which Watson had been seen as a 1968 white over grey 2-door Cadillac, Arizona License Number RYW–010; (6) that Mr. Miles' 1974 Ford had been taken at the time of the armed robbery; (7) that Mr. Miles' car had subsequently been found and that a latent fingerprint lifted from the window of that car had been matched to a known fingerprint of Spencer Watson; (8) that officer Ferrar of the Tucson Police Department had, earlier that morning, seen the 1968 white over grey Cadillac, license number RYW–010, at the premises to be searched; and (9) that while conducting a search of the named premises for Spencer Watson, Detective Reyna had personally observed a pillowcase under a bed, an American Express Credit Card bearing the name "Miles," and a silver and turquoise object, apparently jewelry.

Watson contends that the informant was unreliable and that therefore the warrant did not meet the test of *Aguilar v. Texas,* supra. However, even if we were to agree with Watson on this issue, the warrant was still based on probable cause. Excluding the information provided by the informant, the remaining information within the personal knowledge of the affiant or that had been verified by the personal knowledge of other police officers and related to the affiant was adequate in and of itself to support a finding of probable cause. *State v. Moses,* 24 Ariz.App. 305, 537 P.2d 1363 (1975); *State v. Steele,* 23 Ariz.App. 73, 530 P.2d 919 (1975). We find no error.

## CHANGE OF VENUE

Defendant contends that the trial court erred in refusing to grant his motion for a change of venue based on pretrial publicity. Rule 10.3, Arizona Rules of Criminal Procedure (1973), provides:

"b. Prejudicial Pretrial Publicity. Whenever the grounds for change of place of trial are based on pretrial publicity, the moving party shall be required to prove that the dissemination of the prejudicial material will probably result in the party being deprived of a fair trial."

The fact that a juror merely has some knowledge of the case gleaned from the media is insufficient to require a reversal. *Murphy v. Florida,* 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975). Defendant argues that the record here reveals more than

this. We do not agree. A review of the voir dire does indicate that several jurors had some recollection of having heard or read about the case in the media, however, none of them had any detailed or specific memory of the facts or circumstances involved. We have said:

"* * * the trial court's ruling on a motion for change of venue will not be disturbed on appeal unless a clear abuse of discretion appears and is shown to be prejudicial to the defendant. (citations omitted)" *State v. Ferrari*, 112 Ariz. 324, 332, 541 P.2d 921, 929 (1975).

The trial court here concluded that none of the jurors had been prejudiced by their exposure to pretrial publicity. We find no abuse of discretion in that conclusion.

### SHACKLES

Defendant asserts that it was reversible error to require him to be tried in leg shackles. According to the record, no objection to the leg shackles was made either prior to trial or during the initial questioning of the jury venire. The following transpired:

"THE COURT: You indicated you wanted to take up a matter before the jury is called?

"MR. DAVIS: Yes Your Honor, I would.

"THE COURT: Alright.

"MR. DAVIS: I would ask the Court to permit the shackles on my client's legs be removed. I don't think these are conducive to a fair trial for my client. I have been assured by Mr. Watson there will be no outbreak in Court, or otherwise, and at this time I ask the Court to instruct the deputies that they be removed at this time.

"THE COURT: Are you wanting to be heard?

"MR. BROGNA: For the record I ask the Court to take note of the—well, I can only call it to the attitude of the Defendant when he spoke to the psychiatrist. We didn't get the questions and answers, but we did get an indication of his temperament. The charges he now faces, and the fact he now has two

prior felony convictions—well, charges similar to this.

I, frankly, am afraid to have the Defendant in the courtroom without some restraint.

"THE COURT: Has there been indication to you deputies that there might be any attempt to escape?

"A DEPUTY SHERIFF: The only thing I have is what I have in front of me, and what I have been advised by my supervisors.

"THE COURT: What have you been advised?

"A (By the Deputy Sheriff) What have I been advised?

"Q Yes.

"A What I have here.

"THE COURT: Let me see that, please.

"A Here it is, this up here.

"THE COURT: The Sheriff's Department, or at least whoever made out this form, considers him an escape risk. I think under the circumstances it probably would be better to keep the leg shackles on, then.

I will consider it further later, Mr. Watson, and if it appears your attitude is the same as it has been so far this morning, because your behavior and attitude this morning has been good, and I have no quarrel with the way you have acted up to how, so I will consider the matter of removing those later if your behavior stays the same."

After a further discussion between the defendant's attorney and the court, the judge stated that he would take the motion to remove the shackles under advisement. The jury was then brought back into the courtroom and the trial proceeded. The issue was not raised again by defendant.

■ It is within the sound discretion of the trial judge to have a prisoner shackled when it is necessary to prevent escape or to maintain order in the courtroom. *State v. Moore*, 110 Ariz. 404, 519 P.2d 1145 (1974); *State v. Chavez*, 98 Ariz. 236, 403 P.2d 545 (1965); *State v. Pulliam*, 87 Ariz. 216, 349 P.2d 781 (1960); *State v. Robinson*, 6 Ariz. App. 419, 433 P.2d 70 (1967).

■ We do not view with favor the shackling of a defendant except for the most compelling of reasons. However, absent other facts which were not presented to the court, we do not believe the court abused its discretion in the instant case in allowing the defendant to remain shackled during trial.

### EXPERT WITNESS TESTIMONY

At trial, Detective Reyna testified that a mark on the rear of the Miles' car was a bullet crease. Defendant argues that there was no showing that Reyna was an expert or that he had sufficient training or background to testify to such matters and that therefore it was an abuse of the trial court's discretion to permit Reyna to testify as an expert. We do not agree.

■ Whether a witness is qualified as an expert witness is a determination which lies within the sound discretion of the trial court, and that decision will not be disturbed absent a showing of abuse of discretion. *State v. Kelly,* 111 Ariz. 181, 526 P.2d 720 (1974), cert. denied, 420 U.S. 935, 95 S.Ct. 1143, 43 L.Ed.2d 411 (1975); *State v. Keener,* 110 Ariz. 462, 520 P.2d 510 (1974); *State v. Melot,* 108 Ariz. 527, 502 P.2d 1346 (1972). An expert witness is one who possesses skill and knowledge superior to that of men in general. *State v. Keener,* supra. Here Detective Reyna, in addition to having attended seminars, on the subject of bullet markings, testified concerning his experience as follows:

"Q Detective Reyna, in the course of your training and experience and as a Detective, a Police Officer, have you had occasion to see automobiles or automobile surfaces that have been fired at by high velocity missiles?

"A Yes sir, I have.

"Q What type of experience have you had?

"A I have had, during conjunction with investigations, in which shootings or homicides occurred, I have examined numerous vehicles which have received bullet holes, creases, and indentations such as is shown in the photo, and personally have conducted tests to determine the effect of different angles and weapons and metal surfaces that would be found on a vehicle.

"Q You said you personally have conducted tests, what type of tests?

"A By personally firing at abandoned hulks or vehicles used for soil erosion purposes, and I was able to use a similar surface mark during my investigations and in order to gain personal experience and the cause and effect of different creases.

"Q Based on that experience and experimentation, do you have an opinion what this crease was in the back of Mr. Miles car?

"A It was a bullet crease."

■ In our opinion, the trial court did not abuse its discretion in admitting this testimony.

### FAILURE TO DISCLOSE PORTIONS OF PRESENTENCE REPORT

■ Prior to sentencing, the defendant was provided with a presentence report Part One which stated:

*"DECLARATION OF NONDISCLOSED ITEMS:* Summary and Recommendation are excised in Part One of this report and included in Part Two, as well as the Summary and Recommendation of the codefendant's presentence report, the Summary and recommendation of the prior presentence report (824390) and the original presentence report (A–18302) written prior to the new criminal rules regarding disclosure.

"Information which may disrupt on-going police investigations are excised in Part Three of this report."

No objection was made by defendant to this procedure. Our rules state:

"c. Excision. The court may excise from the copy of the presentence, diagnostic and mental health reports disclosed to the parties:

"(1) Diagnostic opinions which may seriously disrupt a program of rehabilitation,

"(2) Sources of information obtained on a promise of confidentiality and,

"(3) Information which would disrupt an existing police investigation.

"When a portion of the pre-sentence report is not disclosed, the court shall inform the parties and shall state on the record its reasons for making the excision." Rule 26.6(c), Arizona Rules of Criminal Procedure (1973).

In the instant case, portions of the presentence report including police reports, prior presentence reports, rap sheets, and confidential institutional records were excised. Having done so, the court failed, as the rule requires, to state on the record its reasons for excising this material.

In *State v. Pakula*, 113 Ariz. 122, 547 P.2d 476 (1976), we held that the failure of the sentencing judge to state in open court the reason for excising certain portions of the presentence report, while not in compliance with Rule 26.6(c), would be considered waived by the failure of the defendant to object at trial.

The holding in *Pakula*, supra, however, dealt with Rule 26.6(c) alone and not with the additional requirements specifically imposed by A.R.S. § 13-454 which reads in part as follows:

"B. In the sentencing hearing the court shall disclose to the defendant or his counsel all material contained in any presentence report, if one has been prepared, except such material as the court determines is required to be withheld for the protection of human life. Any presentence information withheld from the defendant shall not be considered in determining the existence or nonexistence of [any aggravating or mitigating circumstances]."

The provisions of A.R.S. § 13-454, which, of course, apply only in the instance of sentencing for first degree murder, differ from those of Rule 26.6(c) in two respects. First, under A.R.S. § 13-454, only that material which "is required to be withheld for the protection of human life" may be excised. And secondly, any material so excised "shall not be considered in determining the existence or nonexistence" of any aggravating or mitigating circumstances.

In the instant case, the trial court did not state why certain portions of the presentence report were excised and neither did it indicate that it was not considering that material in imposing sentence, here a sentence of death. It is thus impossible to determine from the record whether or not the provisions of A.R.S. § 13-454 were complied with. In light of the specific requirements imposed by that statute and the severity of the punishment involved, we believe that this matter must be remanded for a new hearing and resentencing.

### INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant next contends that he did not receive effective assistance of counsel at trial.

The United States Supreme Court has said that an attorney's performance must be " * * * within the range of competence demanded of attorneys in criminal cases." *McMann v. Richardson*, 397 U.S. 759, 771, 90 S.Ct. 1441, 1449, 25 L.Ed.2d 763, 773 (1970). We have said that a conviction will be held invalid on the basis of ineffective assistance of counsel only if the representation was a farce, a sham, or a mockery of justice. *State v. Tellez*, 111 Ariz. 34, 523 P.2d 62 (1974). That is also the standard applied by the 9th Circuit Court of Appeals. *United States v. Jones*, 512 F.2d 347 (9th Cir. 1975).

Defendant nonetheless argues that this court should reject the farce, sham, or mockery of justice standard. He cites a number of cases from other jurisdictions which have questioned or rejected this standard. In *Beasley v. United States*, 491 F.2d 687, 696 (6th Cir. 1974), the 6th Circuit Court of Appeals held "that the assistance of counsel required under the Sixth Amendment is counsel reasonably likely to render and rendering reasonably effective assistance." It specifically rejected the mockery of justice standard. In our view, it is the substance of the standard which is significant. As stated by the United States Court of Appeals for the 9th Circuit, "the consti-

tutional requirement of representation at trial is one of substance, not of form." *Brubaker v. Dickson*, 310 F.2d 30, 37 (9th Cir. 1962). A defendant is entitled to a fair trial and as a part of that right he is entitled to competent counsel. However, the adequacy of a defendant's representation will not be judged by the harsh light of hindsight. *In re Williams*, 1 Cal.3d 168, 81 Cal.Rptr. 784, 460 P.2d 984 (1969). Nor do mere tactical errors, per se, constitute inadequate representation. *State v. Farni*, 112 Ariz. 132, 539 P.2d 889 (1975); *State v. Lopez*, 3 Ariz.App. 200, 412 P.2d 882 (1966). We have said that "[a] constitutional right to counsel is fulfilled when he is assigned counsel who is a qualified member of the Bar and acts diligently in the defendant's behalf." *State v. Meredith*, 106 Ariz. 1, 2, 469 P.2d 820, 821 (1970).

In support of his position, defendant argues that his attorney at trial failed to adequately voir dire the jury. The question of how extensive voir dire should be, in light of the danger of offending prospective jurors, is clearly one of tactics. As we have said, tactical decisions at trial, even if incorrect, will not support a claim of ineffective assistance of counsel. Moreover, we have reviewed the voir dire conducted here and find it adequate.

Defendant next submits that his counsel at trial failed to impeach the prosecution's fingerprint evidence and certain identification testimony. In fact, trial counsel did attempt to discredit the prosecution's evidence on both points. With regard to the fingerprint evidence, defendant's counsel was able to establish on cross-examination that only two lifts out of more than one hundred submitted for analysis belonged to the defendant. As for the identification testimony, counsel used several established avenues of questioning on cross-examination in an attempt to discredit the witness. Defendant, discounting these efforts, argues that other available evidence including a scar on the finger in question and an asserted resemblance between defendant and his brother should have been used in his defense. Even if

these contentions are true, we do not believe that the defendant was denied effective assistance of counsel merely because such additional evidence was not offered. See *State v. Wilder*, 22 Ariz.App. 541, 529 P.2d 253 (1974), cert. denied, 423 U.S. 843, 96 S.Ct. 78, 46 L.Ed.2d 64 (1975).

Finally, defendant argues that at his sentencing hearing his counsel was not adequate:

> "Counsel presented absolutely nothing in the way of evidence for the Court to consider bearing upon his history, family situation, job status, mental condition, or the likelihood that a twenty-five year incarceration might make him a changed man."

Since we have, on other grounds, concluded that a new hearing and sentencing must be held, any error in this regard can be cured at the resentencing.

Based upon the record before us, we find no basis for setting aside the verdict and judgment on appeal for lack of effective assistance of counsel.

## THE DEATH PENALTY

Defendant contends that Arizona's death penalty is unconstitutional. Defendant further contends that in any event the sentence of death imposed under the statute should have been life and not death. Defendant asks that if we fail to find the sentence of death was error by the trial court, we should reduce the death sentence to life on appeal.

Since the matter is being remanded for resentencing, we need not consider these matters at this time. If the defendant, on resentencing, is given the death penalty, he may raise these matters again on appeal.

## POST-CONVICTION RELIEF

Following his conviction, defendant pursuant to Rules 24.2 and 32.1, Arizona Rules of Criminal Procedure (1973), filed a motion to vacate judgment, a motion for modification of sentence, and a petition for post-conviction relief. The motions were denied and pursuant to Rule 32.6, the petition was

summarily dismissed without hearing. Defendant filed a petition for review which was automatically consolidated with this appeal. Rule 31.4(b)(2), Arizona Rules of Criminal Procedure (1973).

Rules 24.2 and 24.3 allow motions to vacate judgment and to modify judgment, and we find no error by the trial court in denying the motions based on these two rules.

The summary disposition of the Rule 32 motion is, however, a different matter. Rule 32, labeled "Other Post Conviction Relief" provides that a person may seek relief on the grounds that:

"a. The conviction or the sentence was in violation of the Constitution of the United States or of the State of Arizona;"

And Rule 32.6(c) states:

"c. *Summary Disposition.* The court shall review the petition within 10 days after the petitioner's reply was due. If, upon reviewing the petition, response, reply, files and records, and disregarding defects of form, it determines that no material issue of fact or law exists which would entitle the petitioner to relief under this rule and that no purpose would be served by any further proceedings, it may order the petition dismissed, or grant leave to file an amended petition. Otherwise, the court shall direct that the proceeding continue and set a hearing within 10 days."

The Comment to Rule 32.6 provides in part:

"If the court finds from the pleadings and record that all of the petitioner's claims are frivolous and that it would not be beneficial to continue the proceedings, it may dismiss the petition. * * * However, if the court finds any colorable claim, it is required by *Townsend v. Sain*, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963) to make a full factual determination before deciding it on its merits."

Our Court of Appeals has held that a motion for post-conviction relief based on ineffective assistance of counsel must be determined in a hearing if such claim is colorable. *State v. Suarez*, 23 Ariz.App. 45, 530 P.2d 402 (1975). As stated by that court:

"To be colorable, a claim has to have the appearance of validity. That is, if appellant's contentions are taken as true, do they successfully show ineffectiveness of counsel." 23 Ariz.App. at 46, 530 P.2d at 403.

Defendant's petition lists a number of items already disposed of by this appeal. We are concerned with the allegation that the defendant's "trial counsel failed to conduct an adequate investigation and pursue possible defenses including defective and insufficient consultation with petitioner, failure to present evidence which was available to cast doubt on the testimony of an identifying witness."

 Even though we have held herein that based upon the record on appeal that the defendant has not shown a denial of adequate counsel, this does not mean that at a hearing on the Rule 32 motion he may not be able to show ineffective assistance of counsel such as would bring him under the cases on this subject. In short, we believe that this Rule 32 motion raises a colorable claim of ineffective assistance of counsel which cannot be summarily disposed of without hearing and full factual determination.

 Defendant also argues that he should have been allowed to establish that blacks are systematically excluded from jury duty because it is a known fact that black voters do not register in percentages proportional to their share of the population.

In support of his position, defendant argues that the Federal Voting Rights Act of 1965, as amended, establishes that minorities are under-registered in Arizona. In point of fact, the Act establishes no such thing. By its terms, it applies to states in which less than half of the voting age residents were registered on a given date, 42 U.S.C. § 1973b, and specifically it applies in Pima County because more than 5% of the residents are Spanish speaking. 40 Federal

Register No. 175 at 41827–41828 (9 September 1975). Nonetheless, we do not reject defendant's position on that basis. Rather, we note that even if defendant does establish that blacks do not register in proportion to their share of the community population, which is all he seeks to show, he will have failed to demonstrate any systematic exclusion of blacks for jury duty. Although the registered voters list from which jurors are drawn may not parallel exactly the proportion of each minority within the community, that in no way establishes or even demonstrates systematic exclusion. *Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). As we have stated:

> "A defendant is not entitled to a jury which is composed of, with mathematical precision, the exact proportion of his race as exists in the general population. All that is required is a jury selected by a process where the members of his race are not systematically excluded." *State v. Taylor*, 109 Ariz. 267, 272, 508 P.2d 731, 736 (1973).

The matter is remanded for a resentencing hearing pursuant to this opinion and for a hearing pursuant to Rule 32, Arizona Rules of Criminal Procedure (1973), on the question of effective assistance of counsel.

Remanded.

STRUCKMEYER, V. C. J., and HAYS, HOLOHAN and GORDON, JJ., concurring.

Struckmeyer, V. C. J., dissented and filed opinion.