618 P.2d 592

**The STATE of Arizona, Appellee,**

v.

**Mario David MARQUEZ, Appellant.**

**No. 4968.**

Supreme Court of Arizona,
In Banc.

Sept. 11, 1980.
Rehearing Denied Oct. 28, 1980.

Robert K. Corbin, Atty. Gen. by William J. Schafer, III and Jessica L. Gifford, Asst. Attys. Gen., Phoenix, for appellee.

David F. Alexander, Mesa, for appellant.

CAMERON, Justice.

On 2 August 1979, defendant Mario David Marquez was convicted of a violation of A.R.S. § 13–1206, Dangerous or Deadly Assault By a Prisoner. On 29 August 1979, he was sentenced, in accordance with the mandatory sentencing provision of A.R.S. § 13–1206, to life in prison. Marquez now appeals both conviction and sentence. We have jurisdiction under A.R.S. § 13–4031.

The defendant raises these issues in his appeal:

1. Did the indictment sufficiently advise the defendant of the charges against him?
2. Is A.R.S. § 13–1206 unconstitutional?
3. Was the defendant denied the effective assistance of counsel?
4. Did the trial court err in evidentiary rulings or abuse its discretion in denying the defendant's motion for new trial?

The following facts are necessary to a resolution of these issues. On 7 October 1978, the defendant and another convict by the name of Lozano attacked and seriously injured a fellow inmate at the state prison in Florence. According to the testimony of two prison guards, Marquez, Lozano, and their victim, Billy Plew, were in the prison mess hall with about seventy other inmates when the assault occurred. A guard noticed that Lozano, who was assigned to a job either in the kitchen area or in the serving line, was not doing this work. Instead, Lozano was near the open mess area in which the inmates were eating. Plew stood up with his tray and headed for the

area designated for the return of used eating utensils. When Plew reached the table where Marquez sat, Marquez got up and began fighting with him. As he swung at Plew, Marquez held a clear plastic object in his fist. Plew held his stainless steel tray up as a shield. As Marquez accosted Plew, Lozano circled around behind the victim. While Plew defended himself from Marquez' frontal attack, Lozano stabbed Plew in the back with a 15" knife. After guards subdued the combatants, they found a bloodstained sharp plastic rod on the floor near the scene of the assault. Plew's wounds included a deep cut which pierced his left lung from the rear, a puncture wound on his left shoulder, and a puncture wound under his left eye. The prison doctor testified at trial that the punctures were made with a small round instrument like the piece of plastic found at the scene.

On 24 October 1978, Marquez and Lozano were indicted by a grand jury for assault with a deadly weapon, a knife, while in the custody of the Department of Corrections, in violation of A.R.S. § 13–1206. Attorney Joseph Howard was appointed to represent Marquez. At this time both the State and the defense were unaware that a guard had seen a transparent object in Marquez' hand and that a sharp piece of blood–stained plastic had been found near the location of the assault. The theory on which both sides initially prepared for trial featured Marquez as an accomplice who had decoyed Plew into a position where Lozano could stab him.

A week before the original trial date in March, both prosecution and defense learned of the existence of the small plastic weapon that seemed to correspond with the puncture wounds suffered by Plew. A few days later, Marquez' attorney learned, while interviewing one of the guards who observed the assault, that the guard's notes of his observations were more detailed than his official report on the incident. Upon defense complaint to the State, the prosecutor contacted prison officials. As a result, five reports which had been in the prison's records, but which had not previously been known to the State, were disclosed to both

defense and prosecution. These reports made it clear that one guard had seen Marquez use a clear plastic weapon or "shank," during the assault. Thus, some four months prior to the beginning of jury trial in this case, the accomplice–decoy theory of guilt was supplemented by the theory that Marquez might also be found guilty as a principal, due to the evidence suggesting he had himself stabbed Plew with a plastic shank.

Prior to trial, co–defendant Lozano made a plea bargain with the State, based on his agreeing to disclose to corrections officials the whereabouts of weapons hidden in the prison. Prior to trial, the trial court held the first of three hearings on the defendant's motion for appointment of new counsel. The defendant claimed that Howard had not sufficiently informed him of the progress of his case, had not given him grand jury transcripts, had unduly delayed trial, had advised him to "cop out" and seek a plea bargain, and had failed properly to interview witnesses who would exculpate him. Howard had spent about one–hundred hours on the Marquez case. He detailed his efforts to interview witnesses and to keep the defendant informed; he noted that a grand jury transcript had been supplied to Marquez. The court found that Howard's failure to handle Marquez' case precisely as the defendant ordered was not grounds for new counsel and that Howard had dealt capably and properly with the matter. The motion was denied, but the court later granted the defendant a new lawyer, Robert Hughes, noting that this action was not based on a finding that Howard had been ineffective.

On 2 August 1979, Marquez went to trial and was found guilty. At sentencing, he claimed that his second lawyer had represented him inadequately because Hughes had failed to interview witnesses Marquez considered important. Hughes stated that the several witnesses he had interviewed proved useless because their stories were inconsistent, that he did not interview witnesses the defendant believed would impeach Lozano because Lozano was not

slated to testify for the State, and that he had attempted to interview the victim, who refused to speak with him. The trial court sentenced Marquez to a life term, as required by A.R.S. § 13–1206, and agreed to permit attorney Hughes to withdraw and substitute counsel. This appeal, with a third lawyer representing Marquez, followed.

## INDICTMENT

Defendant alleges on appeal that the indictment insufficiently apprised him of the charge against him. In support of this allegation, he reiterates a claim made below that the State shifted its theory of culpability from an accomplice–decoy theory to a theory that Marquez himself wounded Plew with the plastic shank. The indictment read as follows:

"On or about the 7th day of October, 1978, in the Main Yard Kitchen at the Arizona State Prison, Pinal County, Michael Eugene Logano [sic] and Mario David Marquez, while in custody of the Department of Corrections, assaulted William Allen Plew using a deadly weapon or instrument, to–wit: a knife, in violation of A.R.S. 13–1206 and 13–801."

The record shows that the State did not shift its theory of culpability. Rather, both State and defense widened their efforts in response to the additional facts which came to light during discovery. At trial there was evidence which could support both a finding of guilt as accomplice–decoy and a finding of guilt as principal. If either or both theories were accepted by the jury, the defendant would be found guilty of one count of A.R.S. § 13–1206, the crime charged in the indictment.

We have said that a charging document is "legally sufficient if it fairly indicates the crime charged; states the essential elements of the alleged crime; and is sufficiently definite to apprise the defendant so that he can prepare his defense to the charge. (citation omitted) The test of * * * sufficiency * * * is whether in a subsequent prosecution for the unlawful act described in the information

the defendant could plead the [indictment] as a bar." *State v. Suarez*, 106 Ariz. 62, 64, 470 P.2d 675, 677 (1970).

■ The indictment specifically apprised Marquez of the exact crime he was alleged, and eventually proved, to have committed. He had notice of the State's two theories of culpability. The fact that one of the theories was based on additional incriminating evidence discovered after an indictment was filed against him does not invalidate that indictment. Also Marquez' conviction on the charge of violating A.R.S. § 13–1206 would be a bar to further prosecution based upon the facts given in court. See *State v. Carrico*, 116 Ariz. 547, 570 P.2d 489 (1977); *State v. Juarez*, 111 Ariz. 119, 524 P.2d 155 (1974). We find no error.

## A.R.S. § 13–1206

The defendant makes several arguments in support of the proposition that A.R.S. § 13–1206, which proscribes dangerous or deadly assaults by prisoners, is unconstitutional. The challenged statute reads as follows:

"Dangerous or deadly assault by prisoner

"A person, while in the custody of the department of corrections, a law enforcement agency or county or city jail, who commits an assault using or exhibiting a deadly weapon or dangerous instrument or who intentionally or knowingly inflicts serious physical injury upon another person is guilty of a felony and upon conviction shall be sentenced to life imprisonment and shall not be eligible for suspension or commutation of sentence, probation, parole or release on any other basis until such person has served not less than twenty–five years. A sentence imposed pursuant to this section shall be consecutive to any other sentence presently being served or imposed upon the defendant."

■ Marquez alleges that the consecutive life sentence mandated by this statute is cruel and unusual punishment, violative of both the Eighth Amendment of the United States Constitution and Article 2, Section 15 of the Arizona Constitution. We have

this day fully discussed and determined an identical claim in *State v. Mulalley*, 127 Ariz. 92, 618 P.2d 586.

Since the comparisons with foreign jurisdictions which form part of the basis for our decision upholding the statute in *Mulalley*, supra, take into account differences among defendants and their conduct, we have considered whether Marquez' case includes any factors which might significantly distinguish it from Mulalley's. The present assault is Marquez' third major felony conviction, and his victim was seriously hurt. The first factor triggers enhancement provisions in most states in which harsher sentences for repeat offenders are mandatory. See *Mulalley*, supra. The second factor would give Marquez a more severe sentence than Mulalley's in states where punishment is narrowly graded according to intent or actual harm done. E. g., Conn.Gen.Stat. §§ 53a–35, –59 (1979); Ky.Rev.Stat. §§ 508.010, 532.060 (1975); Mo.Ann.Stat. (Vernon) §§ 558.011, 565.050 (1979); Tenn. Code Ann. §§ 39–604 (Supp.1979), 40–2804, –2806 (1975); Wash.Rev.Code 9A.20.020, 9A.36.010 (1977). Thus, Marquez' case is, if anything, less compelling than Mulalley's insofar as the claim of cruel and unusual punishment is concerned. We find that, while A.R.S. § 13–1206 is an anomaly in our recently–revised criminal code and the punishment it mandates is undeniably harsh, that punishment is not so disproportionate as to be cruel and unusual in the constitutional sense. See *State v. Mulalley*, supra, for analysis and citations.

■ Marquez also alleges that A.R.S. § 13–1206 is unconstitutional because it violates constitutional equal protection rights. This claim, too, was raised and determined in *State v. Mulalley*, supra. For reasons fully articulated in that decision, we hold that the statute does not deprive persons charged under it of equal protection of the laws.

The defendant's third charge against A.R.S. § 13–1206 is that it is too uncertain and indefinite to be understood by a person of average intelligence, thus violating due process standards clearly accepted by this court. *State v. Bateman*, 113 Ariz. 107, 547 P.2d 6, cert. den. 429 U.S. 864, 97 S.Ct. 170, 50 L.Ed.2d 143 (1976); *State v. Menderson*, 57 Ariz. 103, 111 P.2d 622 (1941). In support of this claim, Marquez notes merely that prosecution and defense attorneys argued over what jury instruction would correctly inform the jury of the elements of assault. He does not allege that the statute confused or misled the defense.

The defendant's vagueness challenge seems to focus upon the term "assault" as used in the statute. A.R.S. § 13–1206 is the last provision in Title 13, Chapter 12, entitled ASSAULT AND RELATED OFFENSES. "Assault" is defined as follows in A.R.S. § 13–1203:

"A. A person commits assault by:

"1. Intentionally, knowingly or recklessly causing any physical injury to another person; or

"2. Intentionally placing another person in reasonable apprehension of imminent physical injury; or

"3. Knowingly touching another person with the intent to injure, insult or provoke such person."

■ We do not agree with the defendant that a person of ordinary intelligence would not understand what conduct is forbidden by A.R.S. § 13–1206. Certainly, there is no question of the defendant's having conducted himself in a manner he mistakenly believed to be lawful, having been harmed by the arbitrary application of unduly loose standards, or otherwise having suffered the damaging consequences which flow from vague laws. See *Grayned v. City of Rockford*, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); *State v. Jacobs*, 119 Ariz. 30, 579 P.2d 68 (App.1978). We find that A.R.S. § 13–1206 is specific, clear, and not constitutionally void for vagueness.

Finally the defendant contends that the statute is unconstitutional because its provision of a mandatory term without possibility of probation, parole or commutation unduly limits both the executive and judiciary powers, thus violating Article 3 and Article 5, § 5 of the Arizona Constitution. Article

3 requires the separation of governmental powers among the legislative, executive and judicial branches. Article 5, § 5 provides that:

> "The Governor shall have power to grant reprieves, commutation, and pardons * * upon such conditions and with such restrictions and limitations as may be provided by law."

■■ A.R.S. § 13–1206 does not violate Article 3 by invading executive and judiciary prerogatives; defining crimes and appropriate sanctions for those who commit them is a legislative function. *State v. Quintana*, 92 Ariz. 308, 376 P.2d 773 (1962); *State v. Johnson*, 116 Ariz. 221, 568 P.2d 1119 (App.1977); *State v. Williams*, 115 Ariz. 288, 564 P.2d 1255 (App.1977). Neither does the statute violate Article 5, § 5, which in its very terms provides that the Governor's power to grant commutation may be limited by the legislature.

We find the defendant's constitutional challenges of A.R.S. § 13–1206 to be without merit.

### EFFECTIVE ASSISTANCE OF COUNSEL

The defendant contends that his second lawyer, Hughes, was so incompetent that he was denied his right to effective assistance of counsel. As we have set forth above, the trial judge appointed Hughes at Marquez' insistence, despite the court's expressed belief that his first attorney had been competent. Marquez did not object to Hughes' performance until after he was found guilty. He now alleges that Hughes did not sufficiently familiarize himself with pretrial orders and discovery materials, that he did not interview enough eyewitnesses, that he did not cross–examine or object enough at trial, that he did not call any witnesses in the defendant's behalf, and that he did not say "the defense rests" before the jury.

■ The transcript in this case shows that Hughes built upon the 100 hours' work done by his predecessor in constructing Marquez' defense. He communicated with his client. He attempted to interview the victim, who refused to speak with him. He interviewed three eyewitnesses whom he did not call because they told conflicting stories and could not exculpate the defendant. He cross–examined the State's witnesses and used objections to keep their testimony in proper bounds. He cogently argued the weaknesses of the State's case to the jury in closing and to the court in a motion for new trial. We find no error.

■ Although we have not retreated from the rule that a defendant's claim of ineffective assistance of counsel will be upheld "only if counsel was so inept that the proceedings were reduced to a mere farce, a sham or mockery of justice," *State v. Dippre*, 121 Ariz. 596, 598, 592 P.2d 1252, 1254 (1979), the Ninth Circuit Court of Appeals has held that the farce and mockery standard has become obsolete and that a "reasonably competent and effective representation is a more apt and accurate description of the quality of legal assistance required under the Sixth Amendment." *Cooper v. Fitzharris*, 586 F.2d 1325, 1328 (9th Cir. 1978), cert. den. 440 U.S. 974, 99 S.Ct. 1542, 59 L.Ed.2d 793 (1979). By whatever rule followed, the representation of defendant by Hughes was more than adequate. See *State v. Williams*, 122 Ariz. 146, 593 P.2d 896 (1979). We have stated:

> "In our view, it is the substance of the standard which is significant. As stated by the United States Court of Appeals for the 9th Circuit, 'the constitutional requirement of representation at trial is one of substance, not of form' *Brubaker v. Dickson*, 310 F.2d 30, 37 (9th Cir. 1962). A defendant is entitled to a fair trial and as a part of that right he is entitled to competent counsel. However, the adequacy of a defendant's representation will not be judged by the harsh light of hindsight. (citation omitted) Nor do mere tactical errors, per se, constitute inadequate representation. (citations omitted) We have said that '[a] constitutional right to counsel is fulfilled when he is assigned counsel who is a qualified member of the Bar and acts diligently in the defendant's behalf.' (citation omit-

ted)" *State v. Watson*, 114 Ariz. 1, 13–14, 559 P.2d 121, 133–34 (1976), cert. den. 430 U.S. 986, 97 S.Ct. 1687, 52 L.Ed.2d 382 (1977).

Effective representation does not mean successful representation, *State v. Hughes*, 104 Ariz. 535, 456 P.2d 393 (1969), nor error–free representation, *State v. Farni*, 112 Ariz. 132, 539 P.2d 889 (1975). Neither does counsel need to follow precisely his client's requests in order to adequately represent him. "[T]he power to control trial strategy belongs to counsel." *State v. Rodriguez*, 126 Ariz. 28, 33, 612 P.2d 484, 489 (1980).

## RULINGS BY THE TRIAL COURT

The defendant argues that the trial court should have granted his motion in limine to preclude mention of the plastic "shank" to the jury, should not have allowed a prison guard to give his opinion that Marquez and Lozano were acting in concert, and should have granted his motion for a new trial.

■ Prior to trial, the court denied a defense motion in limine to preclude the State from making any reference at all to the existence of a plastic shank or to the possibility that Marquez might have had such a weapon. The defense based its motion on the theory that to allow the State to mention this weapon would cause evidence in the case to vary unfairly from the indictment. The motion in limine was denied. At trial, the State elicited testimony that a guard had seen a transparent rod in the defendant's hand, that the victim suffered wounds made by a small cylindrical object, and that a blood–stained plastic shank had been found at the assault scene. The latter was not introduced into evidence because the prosecutor did not lay an adequate foundation for its admission. The testimony just summarized was competent and relevant. We find no error. *State v. Cookus*, 115 Ariz. 99, 563 P.2d 898 (1977).

■ The defendant also contends that the trial court invaded the province of the jury by allowing a prison guard to give opinion testimony as follows:

"Almost immediately when the fight started, I saw Lozano moving from some-

where in this area (indicating), moving as if to circle around behind inmate Plew. This is what–the fact that Lozano got up and was circling around behind him made me recognize right away there was a hit going on.

\* \* \* \* \* \*

"There was an obvious skirting movement coming around behind him.

\* \* \* \* \* \*

"In my mind it's very obvious that inmate Marquez was the decoy so Lozano could get behind him and stick him."

Rule 701, Arizona Rules of Evidence, allows a lay witness to give "testimony in the form of opinions or inferences" where these are:

"(a) rationally based upon the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue."

We find that the challenged testimony was properly admitted and did not invade the province of the jury. See *State v. Killian*, 118 Ariz. 408, 577 P.2d 259 (App.1978) (the prison guard gave his opinion that, of several men, only defendant could have stabbed the victim without the guard's seeing him).

Lastly, Marquez contends that the trial court should have granted his motion for a new trial because the evidence was insufficient to support a conviction and because the prosecutor had acted improperly in referring to the plastic shank at trial. As to the plastic weapon, we find no error in the testimony concerning it, or inferences drawn from its existence. See *State v. Sustaita*, 119 Ariz. 583, 583 P.2d 239 (1978). The shank does not provide grounds for a new trial.

■ We have read the evidence in the case and summarized it in the narration of facts, supra. We believe that this evidence supports a finding of guilt on both theories presented to the jury: that Marquez acted to distract Plew while Lozano knifed him in the back, and that Marquez himself stabbed Plew with a weapon capable of causing

serious injury. The trial court did not abuse its discretion by refusing to grant the defendant a new trial.

Both conviction and sentence are hereby affirmed.

STRUCKMEYER, C. J., HOLOHAN, V. C. J., and HAYS and GORDON, JJ., concur.