653 P.2d 351

STATE of Arizona, Appellee,

v.

Michael Steven WATSON, Appellant.

No. 3201–PR–2.

Supreme Court of Arizona,
En Banc.

Oct. 18, 1982.

Robert K. Corbin, Atty. Gen. by William J. Schafer, III, Greg A. McCarthy, Joel M. Glynn, Phoenix, for appellee.

Richard Oseran, Public Defender, by Allen G. Minker, Asst. Public Defender, Tucson, for appellant.

HOLOHAN, Chief Justice.

After a jury trial, appellant Michael Steven Watson was convicted of burglary under former A.R.S. § 13–302, assault with a deadly weapon, former A.R.S. § 13–249(B), and armed robbery, former A.R.S. §§ 13–641 and 13–643(B). He was sentenced to concurrent terms of 10 to 15 years on the burglary and assault charges and 30 years to life on the robbery conviction.

Appeal was taken to the Court of Appeals, Division II, which affirmed the convictions by memorandum decision, No. 2 CA–CR 518 (filed May 14, 1975). However, the court of appeals lacked jurisdiction over the appeal because a life sentence was imposed. Former A.R.S. § 13–1711. Therefore, the court of appeals decision was vacated and appellant was granted the right to file a delayed appeal to this court. *See State v. Canedo,* 125 Ariz. 197, 608 P.2d 774 (1980). We reverse appellant's convictions and remand the case for a new trial.

The facts necessary for our resolution of the case are that on the night of May 24–25, 1974, Harold Foster returned to the apartment, which he occupied with David Foster and John Thomason, at about 1:15 A.M. He discovered a tall black man in his closet. This man told Foster to turn around and sit down; as Foster did so, a shorter black man whom he identified as appellant Michael Watson pointed a gun at Foster and told him to do as he was told. Foster saw the shorter man for a maximum of ten seconds; then the robbers pulled a pillowcase over his head and tied his hands behind him with wire coathangers, removing his wristwatch in the process. The robbers ransacked the apartment and bound and blindfolded the other two occupants, neither of whom saw either of the robbers for more than a few seconds.

In the meantime a neighbor, Lloyd Neal, had noticed that black men were going into the apartment and called the police. The police arrived and captured appellant and codefendant Alfred Williams. After the police freed Harold Foster, they took him outside to identify the suspects. Appellant was taken out of a police car in handcuffs and searched as he was getting out, producing Foster's watch. Foster testified that the officer showed him the watch and asked him to identify it, then asked him to identify the suspect, which he did. The next day, Foster was shown a photographic lineup and picked out two pictures, one of appellant and one of a man named Cercie Wess. Foster indicated that Wess more closely resembled the robber. Foster identified appellant at trial and said that he was not influenced in his identification by the presence of the watch or the fact that appellant was handcuffed and in custody when he first identified him.

Appellant told the same story at the scene and at trial. He testified that he had been at a party at the house next door to the robbery; the defense also called the hostess, who corroborated appellant's presence at her party that night. Appellant, who had walked to the party, left on foot. As he was walking away, his attention was drawn to a shiny object on the ground between the party and the robbed apartment. He picked up the object, discovered it was a watch, and put it in his pocket. Then from the park directly across the street from the house, he heard five or six men coming into the street, yelling at him to give them what he had picked up. He ran toward the back of the house, hoping to find a dark place to hide from his pursuers, and was tackled by a policeman and handcuffed. Codefendant Williams, whom appellant had never seen before, came up and protested the rough police treatment appellant was receiving; Williams was arrested then as well. Appellant testified as follows about what happened next:

Then they sit me inside the car. Then they pulled me back out and a man came out. The police officer say, is this the man?

And the guy said, if he have a watch, that's him.

And that's when the officer searched me.

Q. When he searched you, what did he find?

A. A watch. ... I told the police—I was hancuffed [sic] and I had the watch in my hand—I said, well here is a watch right here. I just picked this off the ground.

And that's when the guy pulled me back in the car.

Codefendant Alfred Williams was tried separately and he was acquitted. Called as a witness for appellant, Williams testified that he was babysitting at his sister's house right behind the house that was robbed that night. Williams heard his sister's dogs barking, went into the backyard to see what was happening, and saw police officers holding appellant down. When Williams tried to find out what was going on, he too was arrested and jailed.

Before the Williams' trial, counsel for Williams requested a hearing pursuant to *State v. Dessureault,* 104 Ariz. 380, 453 P.2d 951 (1969), *cert. denied,* 397 U.S. 965, 90 S.Ct. 1000, 25 L.Ed.2d 257, to contest the prospective in-court identification of Wil-

**3**

liams as being tainted by impermissibly suggestive prior identification. Although appellant's counsel was present at the hearing, he declined to join in the hearing, stating that he had received the file only a few days earlier and could not intelligently conduct the hearing at that time. Although counsel said he would move for an identification hearing for appellant "at a subsequent date," in fact no such motion was ever made. At appellant's trial, his counsel objected to the admission of a photographic lineup shown to witness Thomason as unduly suggestive identification. The following colloquy then took place:

THE COURT: Did you have a Desserault [*sic*] hearing?

[DEFENSE COUNSEL]: Not for Watson.

[THE PROSECUTOR]: We had one with respect to Defendant Williams, but he didn't want one.

THE COURT: You didn't request one for this?

[DEFENSE COUNSEL]: I never had a chance to, no.

THE COURT: What do you mean, you never had a chance. You have to make a motion. Did you make a motion.

[DEFENSE COUNSEL]: No.

THE COURT: What is your position then, since he didn't ask for one. At this time it isn't—

[THE PROSECUTOR]: That would be my position, Your Honor, he was present at the Desseuralt [*sic*] hearing. We were going to hold them together for both parties, and he didn't want to have one. I said okay.

THE COURT: Does the record show that?

[DEFENSE COUNSEL]: What is the last thing you said?

[THE PROSECUTOR]: The record will reflect that he probably reserved his right to have a Desserault [*sic*] hearing.

THE COURT: But never requested one.

[THE PROSECUTOR]: But never requested one.

THE COURT: All right. We will proceed.

Objection overruled.

The record before this court on appeal does not include the transcript of Williams' trial and thus does not reveal the outcome of Williams' motion to suppress the identification. However, the transcript of Williams' *Dessureault* hearing shows that Harold Foster admitted that when he picked out two photographs in attempting to identify appellant Watson, he was not certain of his identification because "Those two pictures looked to me like the same man. I couldn't tell them apart." Foster also said he saw Watson for only one second.

At appellant's trial, a police investigator testified that only one usable fingerprint had been found in the apartment, the fingerprint was of one Timothy Reid, and the items stolen from the apartment were eventually recovered from Reid's residence. Appellant's brother Spencer Watson, a close associate of Reid*, strongly resembles appellant.

Appellant asserts that he was denied the effective assistance of counsel guaranteed by the sixth and fourteenth amendments to the United States Constitution. *Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980); *McMann v. Richardson,* 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970); *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). Appellant urges that this court replace the Arizona "farce, sham, or mockery of justice" test for counsel's effectiveness, *State v. Williams,* 122 Ariz. 146, 150, 593 P.2d 896, 900 (1979), with the Ninth Circuit's standard of "reasonably competent and effective defense representation." *Cooper v. Fitzharris,* 586 F.2d 1325, 1328 (1978). Alternatively, he contends that appellant was denied

---

* *See State v. [Spencer] Watson,* 114 Ariz. 1, 559 P.2d 121 (1976), *appeal after remand,* 120 Ariz. 441, 586 P.2d 1253 (1978), *cert. denied,* 440 U.S. 924, 99 S.Ct. 1254, 59 L.Ed.2d 478 (1979), *appeal after remand,* 129 Ariz. 60, 628 P.2d 943 (1981) and *State v. Reid,* 114 Ariz. 16, 559 P.2d 136 (1976), describing robberies committed by Spencer Watson and Timothy Reid on May 30, 1974, using the same *modus operandi* used by the robbers in this case.

**4**

effective assistance even under the "farce" test.

Appellant presents several alleged incidents of trial counsel's ineffectiveness, including his failure to request a *Dessureault* hearing, failure to request a jury instruction limiting the use of appellant's prior felony convictions to the issue of his credibility, and failure to call Lloyd Neal as an alibi witness. In trial counsel's motion for new trial, he avowed that Neal, who testified at codefendant Williams' trial, would have testified "that people were taking things out of the house for about one hour before the robbery was reported and that these people were *not* defendant, Michael Watson."

■ We believe the time has come to reconsider the "farce, sham, or mockery of justice" standard for counsel's ineffectiveness. Commentators have pointed out that the "farce" standard was originally developed under the fifth amendment's due process clause, and thus this test focused upon the overall fairness of the proceeding. *See, e.g.*, J. Strazzella, Ineffective Assistance of Counsel Claims: New Uses, New Problems, 19 Ariz.L.Rev. 443, 448 (1977); Note: A Functional Analysis of the Effective Assistance of Counsel, 80 Colum. L.Rev. 1053, 1054–55 (1980); *Decoster III:* New Issues in Ineffective Assistance of Counsel, 71 J.Crim.L. & Criminology 275, 275–76 (1980). More recently courts have recognized that the sixth amendment's affirmative grant of the right to counsel is to be considered as a particular requirement of due process demanding consideration separate and apart from the general notion of overall fairness. As a result, the trend over the past decade has been toward replacement of the general due process-based farce, sham, and mockery tests by variants of sixth amendment-based standards. Annot., Modern Status of Rules and Standards in State Courts as to Adequacy of Defense Counsel's Representation of Criminal Client, 2 A.L.R. 4th 27, § 2[a] at 46 (1980).

The United States Supreme Court has stated that an attorney's assistance must be "within the range of competence demanded of attorneys in criminal cases," *McMann v. Richardson,* 397 U.S. 759, 771, 90 S.Ct. 1441, 1449, 25 L.Ed.2d 763, 773 (1970), but that court has never specified the lower boundary of that range. As a result, state courts have developed a variety of tests, most of which are based, like the Ninth Circuit's test, upon the reasonableness of counsels' actions. *See* Annot. 2 A.L.R. 4th 27, § 8 at 109–41 (1980).

■ However, we believe that a better standard would focus directly upon basic notions of competence rather than upon the reasonableness of counsel's actions. We have always held that disagreements as to trial strategy or errors in trial tactics will not support an ineffectiveness claim, as long as the challenged conduct could have had *some reasoned basis. State v. Tison,* 129 Ariz. 546, 633 P.2d 355 (1981); *State v. Flewellen,* 127 Ariz. 342, 621 P.2d 29 (1980); *State v. Rodriguez,* 126 Ariz. 28, 612 P.2d 484 (1980). We believe the proper standard is whether under the circumstances the attorney showed at least minimal competence in representing the criminal defendant. *See United States ex rel. Williams v. Twomey,* 510 F.2d 634, 640 (7th Cir.), *cert. denied,* 423 U.S. 876, 96 S.Ct. 148, 46 L.Ed.2d 109 (1975), requiring "an advocate whose performance meets a minimum professional standard." The focus is thus on the *quality of counsel's performance,* rather than on the effect of that performance on the outcome of the proceeding.

When the *focus of review* is on professional standards rather than reasonableness, the requirements of professional competence can be defined with more precision and applied uniformly to the criminal defense practice. Generally, the concept of minimal professional competence can be described and applied without great difficulty. There is general agreement on many of the areas of what constitutes proper defense practice in criminal cases. In representation of a person accused of crime, every defense attorney would be expected to file pre-trial motions when the facts raise issues concerning the voluntariness of statements, the legality of searches, or the suggestive-

ness of identification. Failure by an attorney to pursue such matters would be considered representation which falls below the minimum standards of professional competence required of defense counsel.

 Of course, not all errors by counsel are harmful to the defendant, and reversal is not required for harmless error. *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Courts generally require the defendant to bear the burden of showing counsel's ineffectiveness. 2 A.L.R. 4th 27, § 5[a] at 72–78 (1980). Once the defendant makes this showing by a preponderance of the evidence, the state bears the burden of showing that the failure, if any, was harmless to the defendant beyond a reasonable doubt under the circumstances of the case.

In the case at issue, several instances of incompetence by counsel are asserted. We need not review each instance because we are satisfied that appellant has sustained his burden of proof by showing that there was a failure by counsel to request a *Dessureault* hearing. The record establishes that there was evidence which raised questions about the suggestiveness of the identification procedures. Minimal competence requires that a defense attorney under such circumstances challenge the reliability of the identification by filing a pretrial motion to have a hearing on the issue. The identification issue was a crucial part of the defense, and the failure to file a timely motion resulted in the loss of any opportunity to prevent the in-court identification.

Since the legal representation of the defendant fell below the standard for minimal competence required of a defense attorney, the appellant is entitled to a new trial with competent representation.

Our resolution of the issue of lawyer competency makes it unnecessary to consider the other issues raised by appellate counsel. Reversed and remanded.

GORDON, V.C.J., and HAYS, CAMERON and FELDMAN, JJ., concur.