685 P.2d 734

STATE of Arizona, Appellee,

v.

Manuel Cota GARCIA, Appellant.

No. 6015.

Supreme Court of Arizona,
In Banc.

June 18, 1984.

Robert K. Corbin, Atty. Gen. by William J. Schafer III and Linda A. Akers, Asst. Attys. Gen., Phoenix, for appellee.

Richardson & Mortensen by Wilford R. Richardson, Safford, for appellant.

CAMERON, Justice.

The defendant, Manuel Cota Garcia, was convicted and judged guilty of three counts of dangerous or deadly assault by a prisoner, and sentenced to concurrent terms of life without possibility of suspension or commutation of sentence or of parole or probation for twenty-five years. A.R.S. § 13–1206. The sentences were to run con-

secutively with the sentence he was already serving. A.R.S. § 13–1206. He appeals.

We must answer the following questions on appeal:

1.  Does the legislatively mandated punishment of life imprisonment constitute cruel or unusual punishment in violation of the Eighth Amendment to the United States Constitution?

2.  Was the prosecutor guilty of prejudicial misconduct at trial?

3.  Should the trial court have directed a verdict of not guilty?

4.  Was the defendant denied a fair trial by ineffective assistance of counsel or by paranoid delusions of persecution?

5.  Are the crimes of endangerment, A.R.S. § 13–1201, or threatening or intimidating, A.R.S. § 13–1202, lesser-included offenses of the crime of dangerous or deadly assault by a prisoner, A.R.S. § 13–1206?

The facts necessary to determine these issues follow. The defendant, a Mexican national, was arrested in Yuma County, Arizona, for burglary. After a plea agreement, he was incarcerated at the Fort Grant Correctional Facility. On the evening of 16 June 1982 the defendant walked away from the facility. His absence was noted, and a search began. He was found by five corrections officers on Fort Grant property but outside the red line which designates the boundary for inmates. He held a metal bar which the officers testified they first thought was a machete. The defendant was ordered by the officers in both English and Spanish to throw down the bar, but he refused. He threatened to kill any officer that moved close enough and swore he was going to die like a man. Three of the officers held .38 caliber pistols and a fourth had a mini 14 semi-automatic rifle. The mini 14 was fired once as a warning, but the defendant continued to swing the bar and threaten the officers. After ten or fifteen minutes of confrontation, one of the officers approached to within six or eight feet of the defendant and sprayed him with tear gas. The defendant dropped the bar and was taken into custody.

The defendant was charged with four counts of deadly assault by a prisoner, but one of the counts was dropped during trial. At trial, he insisted the officers were not in reasonable apprehension of death or physical injury because the officers testified that had the defendant attempted to hit any of the officers or throw the bar the defendant would have been shot. The defendant was found guilty on the remaining three counts, sentenced to the mandatory term of life imprisonment pursuant to statute, and appeals.

## CONSTITUTIONALITY OF THE LIFE SENTENCE

The defendant claims that his life sentence without possibility of parole for twenty-five years constitutes cruel and unusual punishment under the Eighth Amendment to the United States Constitution. In support of this proposition, he cites the recent United States Supreme Court case of *Solem v. Helm*, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983).

■ In that case, Helm was convicted of uttering a "no account check" for $100. Normally such an offense would be punishable by a maximum of five years imprisonment and a $5,000 fine. Helm, however, had three prior burglary convictions and other prior felony convictions for obtaining money by false pretenses, grand larceny, and third-offense driving while intoxicated. Therefore he was subject to South Dakota's recidivist statute and received a life sentence without possibility of parole. His only chance of ever leaving the penitentiary was if the governor commuted his sentence. The United States Supreme Court found that Helm's sentence was excessive to the extent that it violated the cruel and unusual punishment clause of the Eighth Amendment. In determining that the punishment was excessive, the court applied a proportionality rule which considered four objective criteria: (1) the gravity of the

offense, (2) the harshness of the penalty, (3) the sentences imposed on others in the same jurisdiction, and (4) the sentences imposed for commission of the same crime in other jurisdictions. *Solem v. Helm*, supra, at —, 103 S.Ct. at 3010–11, 77 L.Ed.2d at 650.

### 1. Gravity of the offense

In the instant case, the offense was committed by a prison inmate rather than by an habitual criminal as was the case in Helm. Even though there was no physical contact, defendant was threatening conduct which could lead to serious injury and death. It is immaterial that the correctional officers were armed and able to defend themselves. It is the conduct of the defendant that is important, and in the instant case the defendant appeared ready and willing to shed blood, even his own, in order not to be taken back into custody. The fact that defendant was a prisoner enhances the gravity of the offense. Legislative bodies and the courts have long recognized that crimes committed by inmates are more serious than the same crime committed by one not in custody. *Cf. People v. McNabb*, 3 Cal.2d 441, 45 P.2d 334 (1935) (paroled life inmate received death penalty for robbery conviction). There is, then, a significant difference between defendant's crime and the offense involved in *Solem v. Helm*, supra. We believe the offense was sufficiently grave to merit increased punishment.

### 2. Harshness of the sentence

The defense paints a picture of an old man, somewhat confused and distraught, lonely and held captive in a foreign land, merely acting out his fantasies, and not presenting a threat to four armed guards so serious as to warrant the punishment received by the defendant. This overlooks the fact that punishment for crimes committed by inmates has always been more severe than punishment for the same crimes committed by persons not in custody. Increased punishment for crimes of violence or potential violence committed by an inmate acts as a deterrent to other inmate misconduct and helps correctional officials maintain control over the correctional facilities. *Cf. State ex rel. Bean v. Hardy*, 110 Ariz. 351, 352, 519 P.2d 50, 51 (1974) (statute providing for punishment of death for deadly assault by a prisoner serving a life sentence recognizes the near impossibility of controlling one who has nothing further to lose than his life). In the instant case, the legislature has determined the appropriate punishment for the defendant's crime. We need not determine whether the sentence is fair in our view or whether we would impose the same sentence. We must determine only whether it violates the Eighth Amendment as being excessively harsh. We do not find the sentence in this case to be excessively harsh.

### 3. Other crimes in this jurisdiction

The third factor we must consider is the range of sentences imposed for other and similar crimes in the same jurisdiction. The state cites several cases in which the life sentence was upheld in cases of an inmate committing assault. *See State v. (Armando James) Cruz*, 127 Ariz. 33, 35, 617 P.2d 1149, 1151 (1980); *State v. Barnett*, 127 Ariz. 16, 18, 617 P.2d 1132, 1134 (1980); *State v. Fears*, 126 Ariz. 597, 598, 617 P.2d 763, 764 (1980); *State v. Marquez*, 127 Ariz. 98, 102, 618 P.2d 592, 596 (1980). In all of those cases except *Cruz* the inmate inflicted bodily injury upon his victim. Cruz managed to cut the clothing of his victim but did not succeed in penetrating the clothing. Assault with a deadly weapon, A.R.S. § 13–1204(A)(2), is punishable by up to fifteen years in prison if the offender is a first offender and not in custody, A.R.S. §§ 13–701(B)(2) and 13–604(G). In the instant case, the defendant is a prior offender and in custody. We do not believe the sentence is disproportionate to other sentences imposed in Arizona.

### 4. Same crime in other jurisdictions

As to other states, we have said:

In comparing the sentence actually imposed with sanctions provided in other

jurisdictions, we do not, of course, seek to conform our statutes "to the 'majority rule' or least common denominator of penalties nationwide." Rather we seek evidence of what sanctions are currently considered acceptable in our society for the crime committed.

*State v. Mulalley*, 127 Ariz. 92, 96, 618 P.2d 586, 590 (1980) (citations omitted).

Few states have an identical statute, but those with an analogous statute would impose possible punishments of ten years (Pa. Stat.Ann. tit. 18 §§ 1103 and 2703 (Purdon)), twenty years (S.D.Code Ann. §§ 22-18-1.1, 22-6-5.1 and 22-6-1), or fifteen years (Utah Code Ann. §§ 76-5-103(1)(b), 76-5-103.5(1), and 76-3-203(2)). Other statutes provide for up to forty years for assault with a weapon by a prisoner (Colo. Rev.Stat. §§ 18-3-202 and 18-1-105) or up to 100 years for aggravated assault by a persistent felony offender, the description of which would possibly fit the defendant (Mont.Rev. Codes Ann. §§ 45-5-202, 46-18-501 and 46-18-502, plus § 46-18-221 which may provide as much as an extra ten years).

In states lacking a deadly assault by a prisoner statute, one guilty of the acts committed by the defendant in the instant case may receive a life sentence for assault with intent to murder (see e.g. Mich.Stat.Ann. § 28.278 [M.C.L.A. § 750.83]). Habitual offender statutes also increase the possible penalty the defendant might have received for his acts in other states to as much as thirty years (see Fla.Stat.Ann. §§ 775.082, 775.084 and 944.42 (West)).

We do not think the punishment meted out in Arizona is substantially disproportionate to what might be imposed in other states.

■ The sentence received by the defendant does not violate the Eighth Amendment to the United States Constitution or *Solem v. Helm*, supra.

## PROSECUTORIAL MISCONDUCT

■ The defendant claims the prosecutor was guilty of misconduct by asking leading questions and by expressing his opinion of guilt during closing arguments. An example of one of the leading questions concerned the establishment of the element of fear by the state:

Q  As you observe it at this time and as you observed it on the night of the 26th of June of 1982, sir, did you believe it, it meaning the bar, to be readily capable of causing either your death or the other officers' death?

A  . Yes, sir.

Q  Did you also believe, sir, that the way it was being utilized or could be utilized by the inmate it could readily cause serious physical injury?

A  Yes.

We find no error on appeal for two reasons. First, no objection was made to these questions at trial. Failure to object to questions at trial waives these matters on appeal. *State v. Wilson*, 113 Ariz. 308, 310, 553 P.2d 235, 237 (1976). Second, the evidence elucidated or inferred by these leading questions had already been received as the result of proper questioning. At the time these questions were asked the first witness for the state, Sergeant Antonio Andres Jurado, had already testified:

Q  At the time that you got up to a point roughly ten feet from him, what did you feel as far as what the inmate could do to you with that bar?

A  I thought he could really hurt me if I went any closer. Because every time I got a step up to him he come down like he was going to swing it at us. So we backed up.

Even if the questions were leading, by the time they were asked they were not prejudicial due to the other evidence received concerning this matter.

■ The defendant also contends the prosecutor was guilty of misconduct during his argument to the jury. During closing arguments, the prosecutor said:

In this case Judge Lines is going to give you a choice between two crimes. The crime that he's guilty of, the crime I

charged him with, which is deadly or dangerous assault by a prisoner. Or a lesser included offense of the aggravated assault upon a prison guard.

Again there was no objection to these remarks at trial. The defendant claims this argument communicated to the jury the prosecutor's opinion that the defendant was guilty. We agree with defendant that the argument was improper, *see State v. Filipov*, 118 Ariz. 319, 323–24, 576 P.2d 507, 511–12 (App.1977). We do not agree that it is reversible error.

We have held that failure to object to closing arguments at trial waives the objection on appeal absent fundamental error. *State v. Thomas*, 130 Ariz. 432, 435, 636 P.2d 1214, 1217 (1981). Defendant, however, relies upon *State v. King*, 110 Ariz. 36, 40–43, 514 P.2d 1032, 1036–39 (1973), a case in which an objection was made at trial and the court instructed the jury to disregard the remarks. In this case the defendant did not object. In *King*, supra, we held that a much more egregious example of prosecutorial misconduct was not reversible error. Where the evidence of defendant's guilt is overwhelming, we will find the remarks non-prejudicial even with a timely objection. *See id.* Due to the overwhelming evidence of guilt in this case, we do not find the argument constituted reversible error.

## WHETHER A DIRECTED VERDICT WAS APPROPRIATE

■ The defendant contends that the trial court should have directed a verdict of not guilty on the deadly assault charge because, without the answers to the leading questions, there was no evidence to support one of the elements of the crime, that is, that the officers were in "reasonable apprehension of imminent physical injury." A.R.S. § 13–1203(2). We do not agree. First, as indicated above, there was sufficient testimony that the correctional officers were in reasonable apprehension for their safety as the result of non-leading questions. As Officer Jurado stated, "I thought he could really hurt me." Defend-

ant argues, however, that any apprehension would have been unreasonable because the officers were armed. The defendant asks us to hold as a matter of law that any apprehension the armed officers may have had was unreasonable. Under the facts of this case, we cannot do so. *See State v. Williams*, 132 Ariz. 153, 157, 644 P.2d 889, 893 (1982). We find no error.

## INEFFECTIVE ASSISTANCE OF COUNSEL

■ The defendant claims he was denied effective assistance of counsel at trial. In his brief the defendant stated:

Defense counsel did not object to leading questions by the prosecuting attorney regarding whether the bar in the Defendant's hands under the circumstances was a deadly weapon or dangerous instrument. Defense counsel also did not object to leading questions regarding whether the officers involved were in reasonable apprehension of imminent physical injury, nor did counsel object to prosecutor's argument to the jury. Whether such failure to object constitutes ineffective assistance, is not clear. Whether defense counsel was prevented from being more effective by the Defendant's failure to cooperate, is not clear. Whether the Defendant's failure to cooperate was caused by stupidity, poor judgment, or paranoid delusions of persecution, is not clear, but the issues are presented for the Court's consideration and decision.

The standard for determining effective assistance of counsel is "whether under the circumstances the attorney showed at least minimal competence in representing the criminal defendant." *State v. Watson*, 134 Ariz. 1, 4, 653 P.2d 351, 354 (1982). The focus is on quality of representation rather than the effect of that representation on the outcome of the trial. Disagreements in trial tactics will not support a claim of ineffectiveness as long as the conduct has some reasoned basis. *Id.* The defendant must show ineffective assistance of counsel

by a preponderance of the evidence. *Id.* at 5, 653 P.2d at 355.

In the instant case, the failure to object to the prosecutor's questions and arguments could easily have been attributed to trial tactics. The defendant's attorney may not have wanted to draw undue attention to testimony or argument that would surely have been eventually elicited. We do not find that defendant was denied effective assistance of counsel because of the failure to object to leading questions and improper jury arguments.

Defendant also claims that he was denied effective assistance of counsel because of his refusal to cooperate with his attorney. Defendant, on appeal, infers this could have been caused by "stupidity, poor judgment and paranoid delusions of persecution." Defendant admits the reason for his conduct "is not clear," and we agree. We find nothing in the record which indicates that the attitude of the defendant prevented the defendant's attorney from adequately representing him. We have considered the entire record and find that the Watson standard of minimal competence was met by the trial attorney in this case and that the defendant received adequate representation by his counsel.

## INSTRUCTIONS ON LESSER-INCLUDED OFFENSES

The defendant's final contention is that the court erred in not giving requested instructions on two allegedly less-included offenses, endangerment, A.R.S. § 13–1201, and threatening or intimidating, A.R.S. § 13–1202. The court did give an instruction on the lesser-included offense of aggravated assault by a prisoner upon an employee of the Department of Corrections. A.R.S. § 13–1204(7). We have stated:

An instruction on a less-included offense is proper * * * if the crime is a lesser-included offense to the one charged and if the evidence otherwise supports the giving of the instruction. To constitute a lesser-included offense, the offense must be composed solely of some but not all of the elements of the greater crime so that it is impossible to have committed the crime charged without having committed the lesser one.

*State v. Celaya,* 135 Ariz. 248, 251, 660 P.2d 849, 852 (1983) (citations and footnote omitted). Celaya sets forth a two part test for determining whether an instruction to a lesser-included offense must be given; one, the crime must be a lesser-included offense to the one charged, and, two, the evidence must support giving the instruction. *Id.; See also State v. Dugan,* 125 Ariz. 194, 195, 608 P.2d 771, 772 (1980).

The elements of dangerous or deadly assault by a prisoner under A.R.S. § 13–1206, as they apply to the evidence in this case, are: (1) a person while in the custody of the Department of Corrections, (2) commits an assault, (3) using a dangerous instrument. The elements of endangerment are: (1) recklessly endangering another person, (2) with a substantial risk of imminent death or physical injury. The elements of threatening or intimidating are: (1) threatening or intimidating (by word or conduct) to cause injury or property damage (2) with the intent to terrify. Admittedly, all of the elements of endangerment and threatening or intimidating can be found within the crime of dangerous or deadly assault by a prisoner. However, the crime of dangerous or deadly assault by a prisoner is a status offense which depends equally upon the status of the defendant as a prisoner as it does upon the conduct of the defendant. To be a lesser-included offense, the crimes of endangerment and threatening or intimidating must be committed by a prisoner. There is a lesser-included offense of assault upon an employee while a prisoner and the court properly instructed the jury as to that offense. There is no such crime as endangerment while a prisoner or threatening while a prisoner. The crimes of endangerment or threatening or intimidating are not lesser-included offenses of assault by a prison-

er, and the court did not err in refusing to give such instruction. We find no error.

Affirmed.

HOLOHAN, C.J., and HAYS, J., concur.

FELDMAN, Justice, dissenting.

The majority opinion upholds the constitutionality of this statute by applying the three step analysis required by *Solem v. Helm*, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983). I believe that analysis is useful only as a starting point in this rather unusual case. The majority concludes that the legislature has the power to prescribe severely enhanced punishment for crimes committed by a prisoner. Under the test used in *Solem* this is no doubt true, but I believe the majority has overlooked a more important issue hidden by the abstract principle of enhanced punishment.

Defendant was charged under A.R.S. § 13–1206, entitled "Dangerous or deadly assault by prisoner," a statute unique in our criminal code.[1] All other felonies fall within one of six classifications which determine the severity of the range of punishment which may be applied by the court. A.R.S. §§ 13–701 and 702. In all other felonies, including first degree murder (A.R.S. § 13–1105), the trial court is permitted to exercise some discretion in sentencing within the range set by the legislature. *See* A.R.S. §§ 13–601, *et seq.* and 13–701, *et seq.*[2] With regard to 13–1206, however, there is neither range nor discretion, only an absolute requirement that upon conviction the defendant be sentenced to life imprisonment without possibility of parole for a period of twenty-five years and that such term be consecutive to all other sentences. I dissent because I believe that constitu-

tional principle forbids the legislature from depriving the judicial branch of government of discretion to consider either the nature of the act committed or the nature of the criminal.

In my view, it is not possible to determine in the abstract whether a punishment required by statute is proportionate. The court must make that determination in light of the actual facts and the defendant's individual culpability. *People v. Dillon*, 34 Cal.3d 441, 479, 194 Cal.Rptr. 390, 414, 668 P.2d 697, 721 (1983). This view is supported by the language used by the United States Supreme Court in *Solem v. Helm, supra;* the Court stated that it was impossible to hold that a penalty was *per se* constitutional. Any penalty might be unconstitutional in given circumstances. *Solem v. Helm*, 103 S.Ct. at 3009–10. The Supreme Court cautions us that:

> Reviewing courts ... should grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishment for crimes, *as well as* to the discretion that trial courts possess in sentencing convicted criminals.

*Id.* at 3009 (emphasis supplied).

If proportionality is the issue, it cannot be judged by simply referring to the title of the statute under which the defendant has been charged and convicted. Courts must also consider the facts of the crime, the totality of circumstances which surround the act, the motive, the manner of commission, the extent of defendant's culpability and the consequences or harm brought about by his acts. *People v. Dillon*, 34 Cal.3d at 479, 194 Cal.Rptr. at 413, 668 P.2d at 720. The court must consider too, the "nature of the offender" and in doing

---

1. *See* Gerber, Criminal Law of Arizona 176 (1978) (This section "was neither recommended by the Code Commission nor modeled on any other recent Code revision"). Section 13–101 states, in part,

   It is declared that the public policy of this state and the general purposes of the provisions of this title are:

      *    *    *    *    *    *

4. To differentiate on reasonable grounds between serious and minor offenses and to prescribe proportionate penalties for each;
   *see also* § 13–101(3).

2. One other statute, A.R.S. § 13–604.01(A) (offenses committed while released from confinement) reaches the same result as § 13–1206, by means of enhancement of punishment and is subject to the same problems as § 13–1206.

so must look at concrete facts rather than abstractions. The inquiry "focuses on the particular person before the court, and asks whether the punishment is grossly disproportionate" to his "individual culpability." This is to be determined by reference to "such factors as his age, prior criminality, personal characteristics, and state of mind." *Id.* at 479, 194 Cal.Rptr. at 413–14, 668 P.2d at 720–21. This concept, too, has been recognized by the United States Supreme Court in *Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 3377, 73 L.Ed.2d 1140 (1982). Although dealing with the death penalty, I believe the principles set forth in *Enmund* are applicable to all felonies, certainly those which require punishment as severe as that before us in the case at bench.

> The focus must be on [defendant's individual] culpability ... for we insist on 'individualized consideration as a constitutional requirement ...', which means that we must focus on 'relevant facets of the character and record of the individual offender.'

*Id.* (citations omitted).

The only conclusion which may be drawn from the foregoing is that, within rational limits set by the legislature, the trial courts *must* be given the power to consider the facts and tailor the punishment to fit both the crime and the criminal. A.R.S. § 13–1206 not only inhibits this function, it prohibits it and requires the court to apply a specific punishment to all cases that fit under the label of the statute no matter what the real facts may be.

It is possible, I suppose, to draft a statute so narrow as to insure that all those convicted deserve a single, specific punishment. *See, e.g., Commonwealth v. Bryant,* 239 Pa.Super. 43, 361 A.2d 350 (1976), upholding a life sentence for crime of assault by a life prisoner. That is not the type of case before us. We have previously upheld this very statute on the basis of an analysis of "significant" factors which include the "prior criminal record of the defendant and defendant's intent or the actual harm caused by defendant's conduct." *State v. Fears,* 126 Ariz. 597, 598, 617 P.2d 763, 764 (1980), explaining the basis for decision in the previous cases of *State v. Mulalley,* 127 Ariz. 92, 618 P.2d 586 (1980) and *State v. Marquez,* 127 Ariz. 98, 618 P.2d 592 (1980).

Indeed, when analyzed under this two-pronged standard, the true facts of this case illustrate the vice of imposing a single mandatory punishment on all those who may be convicted. Defendant's prior criminal record consisted of a plea bargained conviction of two counts of theft (A.R.S. § 13–1802) after he had been captured in 1980 on the roof of a store in San Luis, Arizona with a small amount of merchandise. He received two concurrent five year sentences as a non-dangerous, non-repetitive offender. He had no prior criminal history. At the time of the theft he was illegally in this country.

According to the presentence report defendant attempted suicide while serving at the Arizona State Prison. A psychological evaluation referred to several episodes of "apparently psychotic behavior, with delusions of a religious nature that led to serious attempts at suicide." A history of "alcohol abuse" was reported. "The most likely diagnosis would be paranoid schizophrenia with secondary depression." The stresses precipitating the psychotic episodes were thought to be (1) loneliness in a strange country; (2) inability to communicate with his family in Sonora (defendant has a wife, six children, twenty-one brothers and sisters and an eighty-five year old father; he is illiterate in his only language, Spanish); (3) inability to communicate with those around him (because he speaks only Spanish).

At some time the defendant was transferred to the Fort Grant Training Facility, where the events leading to his present conviction took place. On June 26, 1982 he walked away from the prison compound. He was trailed and eventually spotted near the road about 300 yards from the southern perimeter of the prison property. He was standing near a mesquite tree on a knoll about six feet above an arroyo. Five offi-

cers approached him. In both English and Spanish they ordered him to drop his "weapon" and surrender. He wagged the 20 inch long metal bar he was holding and told the officers not to come nearer or he would kill them. He responded to the officers' orders by saying "no." He then said such things as "Tell him to shoot me" (referring to the officers with guns), "I'm going to die like a man. He's going to have to shoot me." "I'll kill the first one that comes up here." [TR at 34].

The testimony was that four officers approached and formed a semi-circle about ten feet or so in front of the defendant, while a fifth, unarmed officer stood farther away. Lt. Davis, a weapons specialist trained in hostage negotiation, was armed with a Ruger Mini 14 semi-automatic rifle; two other officers had .38 caliber Smith & Wesson pistols drawn. The fourth officer, standing slightly behind and to the side of Lt. Davis, was unarmed. This officer initially thought defendant had a machete but soon noticed that the instrument was a metal bar with which defendant "could really hurt me *if* I went any closer." [TR 35, emphasis supplied]. One of the armed officers agreed that he only got as close to defendant as he thought was safe under the circumstances. [TR at 69].

The stand-off continued for some ten to fifteen minutes in the flood lights emmanating from the officers' vehicle parked on the road nearby. During this time each officer apparently shouted orders five or more times, that the defendant drop his weapon. The defendant responded by threatening to "kill" the officers and, more frequently, by challenging them to kill him. Toward the end of the stand-off Lt. Davis shot a round from his rifle into the air. Defendant paused, challenged the officer to kill him and then continued wagging the bar. A few moments later an officer went to the vehicle and returned with a tear gas cannister. Lt. Davis then took the cannister, approached within about six feet of the defendant, and sprayed the gas toward the defendant. During this maneuver, Lt. Davis testified that he felt he was the focus of the defendant's attention and that he was

quite apprehensive—"I felt more like he [the defendant] was getting ready to come after me than he was going to throw it [the bar]." [TR at 107]. Lt. Davis was thus ready to use the semi-automatic rifle he had in his left hand. The gas took its effect. Defendant blinked, shook his head and dropped the bar [TR at 108]. He was rushed by two officers and taken to the ground (apparently without a struggle).

At his arraignment, defendant seemed to have little understanding of the charges. He believed that he had been already adjudged guilty and sentenced. He refused to sign any papers. The interpreter's attempts to explain the proceedings did not register; defendant did not comprehend the proceedings. He could not plead, and the judge ultimately directed that the record show the defendant pled "not guilty."

Defendant put on no defense. He offered nothing at the sentencing hearing. We have no way of knowing what more defendant might have shown in mitigation. There being no discretion or choice in sentence, defendant made no attempt to show further mitigating circumstances. What was established, however, would ordinarily have been considered in aggravation or mitigation of punishment. But under § 13–1206, unique in our books, it made no difference. Defendant received the same penalty as if, serving a life sentence for murder, he had escaped, stolen an automatic rifle, and tried his best to shoot the officers who were in pursuit.

In my view, a statute which prohibits the trial judge from considering the true facts of a crime offends the principles of *Solem v. Helm* and violates the "cruel and unusual punishment" proscriptions of both Eighth Amendment of the United States Constitution and Article 2, § 15 of the Arizona Constitution. It also violates Article 3 of the Arizona Constitution which prohibits any department of government from exercising the powers "properly belonging to either of the others." Making the punishment fit the crime and criminal is a judicial function. The legislative function

is confined to setting the range and type of punishment.

It is ironic, and too late for this defendant, that this principle has probably come to the attention of the legislature. A.R.S. § 13–1206 was amended at the last legislative session and signed by the Governor on May 1, 1984. The offense has now been reduced to a class 3 felony with a range of enhanced punishment. The legislature has amended the statute but can do nothing to ameliorate a "cruel and unusual" punishment already imposed. We have both the power and the duty.

GORDON, Vice Chief Justice:
I concur with Justice Feldman's dissent.